**UNITED STATES of America, Plaintiff,**

**v.**

**CHARLOTTESVILLE REDEVELOP-
MENT AND HOUSING
AUTHORITY, Defendant.**

**Civ. A. No. 86–0033–C.**

United States District Court,
W.D. Virginia,
Charlottesville Division.

July 24, 1989.

E. Montgomery Tucker, Asst. U.S. Atty., Roanoke, Va., Brian Heffernan, Housing and Civil Enf. Sec., Civil Rights Div., Dept. of Justice, Washington, D.C., for plaintiff.

Ronald W. Tweel, Charlottesville, Va., for defendant.

## MEMORANDUM OPINION

MICHAEL, District Judge.

This action was brought by the United States to challenge the allegedly race-conscious, preferential plan employed by defendant Charlottesville Redevelopment and Housing Authority ("CRHA") to assign tenants to its public housing facilities from its waiting list. Both sides seek summary judgment, the United States asking for judgment which would strike down CRHA's plan and CRHA asking that this court declare their preferential plan to be acceptable legally. For the reasons elaborated below, this court finds that CRHA's tenant assignment plan violates 42 U.S.C. § 3604(a), (b), and (c) and, therefore, grants the motion for summary judgment of the United States.

### I.

For twenty-five years, defendant CRHA has operated public housing projects in Charlottesville, Virginia. Arrington Affidavit, ¶ 25. From 1964 until 1980, CRHA operated only one public housing project, the Westhaven Project, and the residential units of this project were rented by blacks only, except for a period of several months in the 1970s. *Id.* at ¶ 28. In 1980, CRHA developed a new tenant selection policy which gave preferential treatment to white applicants for public housing in Charlottesville and which aimed, on its own terms, to achieve a 50/50 mix of black and white residents in its public housing. *Id.* at ¶ 31. As a result of this policy, black applicants for spaces in the public housing projects administered by CRHA have had to wait considerably longer than white applicants.[1] The disparity in waiting time is not disputed by defendant CRHA. Memorandum in Support of Defendant's Motion for Summary Judgment at 2. This matter is ripe for summary judgment because the material facts surrounding the public housing administered by CRHA and the contours of its preferential selection process are not in dispute. Rule 56, Fed.R.Civ.P.

### II.

The United States alleges that CRHA violates a number of sections of the Fair Housing Act through its policy which gives certain preferences to white applicants for rental units. Specifically, plaintiff alleges that the tenant assignment policy of CRHA violates 42 U.S.C. § 3604, subsections (a) through (d).[2] In particular,

---

1. The length of the waiting period varies according to the size of housing unit sought, but in most cases, black applicants have had to wait two to three times longer than white applicants who are similarly-situated (except for their respective racial identifications).

2. The relevant sections of the Fair Housing Act, codified as 42 U.S.C. § 3604, hold that:

   [I]t shall be unlawful—
   (a) To refuse to sell or rent after the making of a bona fide offer, or to refuse to negoti-

ate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, or national origin.

   (b) To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because or race, color, religion, sex, or national origin.

plaintiff alleges that the policy instituted by CRHA and the administrative actions spawned by that policy (1) "make unavailable or deny ... dwelling[s] to [blacks] because of race ...," (2) "discriminate against [blacks] in the terms, conditions, or privileges of ... rental of ... dwelling[s] ... because of race ...," (3) constitute statements with respect to the rental of housing units which indicate a "preference, limitation or discrimination" which is based on race, and (4) constitute representations to blacks that "because of race" "that ... [a] dwelling is not available for inspection, sale, or rental when such dwelling is in fact so available."[3]

Plaintiff has not offered evidence of any individual black applicant or would-be tenant of CRHA public housing who can testify that he or she did not receive any public housing at all because of their race. However, plaintiff need not offer this sort of proof in order to prevail in its claim. It is not necessary for the court to find that blacks have been turned away from public housing by CRHA, that they have been told not to apply for public housing, or that they have been told that they would not be eligible for apartments at all. Rather, for the purposes of assessing whether there has been a violation of 42 U.S.C. § 3604(a)–(c), being made to wait longer because of race than is justified for public

housing is functionally equivalent to being denied public housing.[4]

The court finds, after examining the contours of the tenant assignment plan of CRHA and the allegations offered by plaintiff, that the circumstances of this case are such that this court is properly guided by persuasive precedent. *United States v. Starrett City Assoc.*, 840 F.2d 1096 (2d Cir.), *cert. den.*, —— U.S. ——, 109 S.Ct. 376, 102 L.Ed.2d 365 (1988). In examining a pattern of preferential assignment of white applicants to a low income housing complex which was privately owned, the Second Circuit found that, despite the concededly beneficial intention of the preferential plan, its effects were legally impermissible. "Housing practices unlawful under Title XIII include not only those motivated by a racially discriminatory purpose, but also those that disproportionally affect minorities." *Id.* at 1100. Motivation alone will not serve to save an otherwise constitutionally or legally infirm plan. Furthermore, the fact that the housing complex in *Starrett City* was privately owned did not serve to put it beyond the purview of the Title XIII challenges brought by the United States. *Id.* at 1100–1101. As does CRHA *infra*, the appellant in *Starrett City* raised the defense of the "tipping phenomenon": the prospect that "white flight" will affect

(c) To make, print, or publish, or cause to be make, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination.

(d) To represent to any person because of race, color, religion, sex, or national origin that any dwelling is not available for inspection, sale, or rental when such dwelling is in fact so available.

**3.** This court finds that the policy of CRHA does not run afoul of 42 U.S.C. § 3604(d) because the effect of the policy, on its own terms, means that the units in question which are rented to a white applicant in preference to a black applicant are not actually available to the black applicant in question although, by this opinion, the court finds that those units should be open to the eligible black applicant. Section 3604(d) addresses an issue of misrepresentation, of a refusal of a landlord to indicate that unoccupied properties are open for rental.

**4.** Since blacks must stay on the waiting list much longer than whites to get apartments, is it

not possible that, were such a policy to persist, some blacks either already have or would in the future drop off those lists? A positive answer to this hypothetical question is not necessary, once again, in order for this court to find that there has been a violation of the Fair Housing Act by CRHA. However, the possibility that such attrition from the waiting list by blacks could occur, or even the serious threat that CRHA's policy would produce such attrition, only serves to buttress this court's finding that a black applicant being made to wait two to three times longer than a similarly-situated white applicant for public housing is the functional equivalent of that person or family being denied public housing. *Cf. Williamsburg Fair Housing Comm. v. New York City Housing Auth.*, 493 F.Supp. 1225, 1248 (S.D.N.Y.1980) ("In the case at bar, much of the discrimination rests on the unfavorable treatment given non-Whites ... The Court may also infer that non-Whites were discouraged from ever applying for ... apartments because of the quota....")

the complex and, in the case of the *Starrett City* the entire neighborhood, leaving the complex effectively or virtually segregated. The Second Circuit also distinguished between programs which elicit minority participation and those which limit the access of minorities or disadvantaged groups.[5] Finally, the Second Circuit held that such a preferential treatment is not permissible when the program in question is not temporary and has not been enacted to remedy specific past discrimination. *Id.* at 1102–03.

### III.

Since this court has before it cross motions for summary judgment, the arguments advanced and the defenses offered in response to those arguments are largely mirror images of each other. Therefore, the court will turn to the defenses offered by CRHA as a rebuttal to plaintiff's motion for summary judgment and as support of CRHA's own motion for summary judgment.

### A.

■ CRHA argues that since the Richmond Area Office of Housing and Urban Development ("HUD") commended CRHA's attempt to integrate its housing units, this approval by HUD serves to estop the United States from pursuing this action. Memorandum in Support of Defendant's Motion for Summary Judgment at 4–5. HUD not only "commended" CRHA in 1981 for these efforts but reviewed its plan in 1983 and suggested additional ways to make the efforts at integration more effective. *Id.* at 5. There are three reasons why this proffered defense is not sufficient to turn away plaintiff's allegations. First, a mere letter of approval from a HUD field office could hardly be considered sufficient to estop the United States. Second, the government is treated altogether differently when it comes to the doctrine of estoppel. As the Supreme Court has concluded,

> When the government is unable to enforce the law because the conduct of its agents has given rise to an estoppel, the interests of the citizenry as a whole in obedience to the rule of law is undermined. It is for this reason that it is well-settled that the government may not be estopped on the same terms as any other litigant.

*Heckler v. Community Health Services of Crawford County,* 467 U.S. 51, 60, 104 S.Ct. 2218, 2224, 81 L.Ed.2d 42 (1984). Finally, this putative approval by a HUD field office of CRHA's plan does not give defendant the authority or freedom to violate the provisions of the Fair Housing Act. As a district court in New York has observed, "HUD has no power to excuse discriminatory acts or to waive, on behalf of those injured by them, the right to seek a remedy." *United States v. Yonkers Bd. of Educ.,* 624 F.Supp. 1276, 1375 (S.D.N.Y. 1985).

### B.

■ CRHA argues that it is under a legal duty to integrate its projects. In support of this, they cite 42 U.S.C. § 3608(e)(5) which holds, in pertinent part, that "The Secretary of Housing and Urban Development shall ... administer the programs and activities relating to housing and urban development in a manner affirmatively to further the policies of this subchapter."[6] However, even this affirmative duty is constrained by supervening consti-

---

5. The Second Circuit observed that, "[M]easures designed to increase or insure minority participation, such as 'access' quotas, have generally been upheld. However, programs designed to maintain integration by limiting minority participation, such as ceiling quotas are of doubtful validity ... because they '"single[ ] out those least well represented in the political process to bear the brunt of a benign program."'" *Starrett City,* 840 F.2d at 1102 (citations omitted).

6. While some courts have been leary of extending this duty from HUD itself to other government agents such as localities, *e.g., Resident Advisory Bd. v. Rizzo,* 564 F.2d 126, (3d Cir. 1977), *cert. den. sub. nom., Whitman Area Improv. Council v. Resident Advisory Bd.,* 435 U.S. 908, 98 S.Ct. 1457, 55 L.Ed.2d 499 (1978), the Second Circuit has held that this affirmative duty applies not only to HUD itself, but also to other actors. *Otero v. New York City Housing Auth.,* 484 F.2d 1122 (2d Cir.1973).

tutional limitations and, thus, acts taken ostensibly to carry out this affirmative duty must fit within the limitations expressed by the policy of the Fair Housing Act. That policy, as expressed in the Act itself, is that "It is the policy of the United States to provide, *within constitutional limitations,* for fair housing throughout the United States." 42 U.S.C. § 3601 (emphasis added). Therefore, CRHA would need to show additional judicial or legislative support for its duty to integrate and how this duty to integrate could be seen either to mesh with or curtail its duty to avoid discrimination within the context of the instant case.

In support of its allegation that it is under a duty to integrate, CRHA has recourse to the legislative history of the Fair Housing Act. This history alone, in part because it is skeletal, does not settle the question, although it does illuminate the intent of at least some of the authors of the legislation. A principal sponsor of the Fair Housing Act, Senator Mondale, concluded that,

> I know of no single action we could take which would contribute more to understanding, to peace and justice within our country, and to this moral decency of all Americans than the simple matter of Congress declaring that we have had the last of segregation in the sale and rental of living quarters in the United States, and that once and for all we have decided, as a Nation, to live together, and not separately.

114 Cong.Rec. 3422 (1968). Unfortunately for CRHA, the legislative history is equivocal as regards its argument for an overriding duty to integrate. For example, Senator Mondale also observed that "We readily admit that fair housing by itself will not move a single Negro into the suburbs—the laws of economics will determine

that." 114 Cong.Rec. at 3422. Another prominent supporter of the legislation, Senator Brooke, concluded that "America's future must lie in the successful integration of all of our many minorities.... That future does not require imposed residential ... integration; it does require the elimination of compulsory segregation in housing...." 114 Cong.Rec. at 2524–25.

While there is a clearly expressed hope that this Act will assist in residential desegregation, a hope which, in the light of history since, seems almost naive in its belief that such a goal could be realized in the very near future, these comments also serve to suggest to this court that the strong prohibition against discrimination in the provision of housing was the primary, if not the overwhelming and overriding, impulse behind the Fair Housing Act.[7]

CRHA also argues that other jurisdictions have recognized that the Fair Housing Act imposes a duty to integrate. For example, defendant cites a First Circuit case where the Court of Appeals concluded that "[E]very court that has considered the question has held or stated that Title VIII imposes upon HUD an obligation to do more than simply refrain from discriminating (and from purposely aiding discrimination by others)." *NAACP v. Secretary of Housing and Urban Development,* 817 F.2d 149, 155 (1st Cir.1987). In the main, CRHA relies on a Second Circuit decision, *Otero v. New York City Housing Auth.,* 484 F.2d 1122 (2d Cir.1973), as support for its claim that it is under a legal duty to take steps similar to those in question here in order to integrate its housing. In that case, the Second Circuit held that "The Authority is obligated to take affirmative steps to promote racial integration even though this may in some instances not op-

---

7. As noted *supra,* the declaration of policy of the Fair Housing Act states: "It is the policy of the United States to provide, within constitutional limitations, for fair housing throughout the United States." 42 U.S.C. § 3601. In commenting upon the import of that declaration, Senator Mondale explained that

> Obviously, this [§ 3601] is to be read in context with the entire bill, the objective being

> to eliminate discrimination in the sale or rental of housing ...

> Without doubt, it means to provide for what is provided in the bill. It means the elimination of discrimination in the sale or rental of housing. That is all it could possibly mean.

114 Cong.Rec. 4975.

erate to the immediate advantage of some non-White persons." *Id.* at 1124.

There are two objections to CRHA's attempt to identify an all-preempting duty to integrate. The first problem, discussed more thoroughly *infra*, is that the mere establishment of the existence of a duty to integrate does not legitimate any and all specific policies taken in furtherance of that duty. That is, defendant may well be under a duty to integrate, but the mere existence of that duty does not mean that defendant is free to take any steps it wishes in furtherance of that duty. That duty cannot be read as omnipotent in its pre-emptiveness, bowling over every other sort of Constitutional or other legal restraint which also is relevant. In fact, the very declaration of policy, enacted as a part of the Fair Housing Act, clearly demonstrates that actions taken by state actors in furtherance of the policy of the Act must be assessed within the constraints imposed by the Constitution. 42 U.S.C. § 3601.

Second, CRHA's attempt to defend its racially preferential practice on the basis of the duty to integrate as defined by *Otero* cannot be successful because *Otero* itself has been significantly narrowed by the more recent Second Circuit case of *Star-rett City*. Differences between the situation in *Otero* and the instant case, especially as modified by the holding in *Starrett City*, are instructive. For example, in *Otero* the policy concerned the opening of a new housing project. It was a one-time policy. The "tipping" phenomenon used to justify the policy in *Otero* was a threat not simply to the public housing complex but a threat of tipping presented to the entire neighborhood. *Otero*, 484 F.2d at 1135–36.[8]

It cannot be denied, however, that CRHA is correct when it argues that integration—in housing as well as in other aspects of life—is a prominent and significant policy goal of the law.[9] Contrary to the government's argument, this court finds that defendant must operate its housing units so as to promote integration in housing within the limits set by the constitution and laws of the United States. This duty is pursuant to a goal which has been recognized by the Supreme Court. *Linmark Assoc. Inc. v. Willingboro*, 431 U.S. 85, 94–95, 97 S.Ct. 1614, 1619–1620, 52 L.Ed.2d 155 (1977). The loss of the opportunity to live in integrated housing, in an integrated neighborhood, is an injury.[10] *Trafficante v. Metro-*

---

**8.** "Tipping" refers to a particular social theory which purports to explain the so-called "white flight" phenomenon. The court in *Otero* feared that adherence to racially neutral criteria would "create a non-white 'pocket ghetto' that would operate as a racial 'tipping factor' causing white residents to take flight and leading eventually to non-white ghettoization [sic] of the community." 484 F.2d at 1124. CRHA has not demonstrated that a demographic similarity to the situation in *Otero* exists in the instant matter. If, indeed, "white flight" is part of the social dynamics which shape the housing patterns of Charlottesville, this court remains unconvinced that the virtual sanctification of discrimination represented by the CRHA plan is the appropriate response. Surely, such a degree of "flight" must be fuelled, at least in part, by prejudicial responses. This court is gravely concerned about a policy which merely builds on that prejudice. As the Supreme Court concluded in *Palmore v. Sidoti*, "Private biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect." 466 U.S. 429, 433, 104 S.Ct. 1879, 1882, 80 L.Ed.2d 421 (1984).

**9.** As the Supreme Court has stated,
> There can be no question about the importance of achieving this goal [promoting stable, racially integrated housing]. This Court has expressly recognized that substantial benefits flow to both whites and blacks from interracial association and that Congress has made a strong national commitment to promote integrated housing.

*Linmark Assoc. Inc. v. Willingboro*, 431 U.S. 85, 94–95, 97 S.Ct. 1614, 1619–1620, 52 L.Ed.2d 155 (1977) (citation omitted).

**10.** It is one thing to highlight, quite properly, integration as an important principle or goal. However, it is something quite different to use cataclysmic language to depict what may occur if a plan giving preference to white applicants does not continue. The Supreme Court has indicated with some care how "Classifications based on race carry a danger of stigmatic harm," *City of Richmond v. J.A. Croson Co.*, ――― U.S. ―――, 109 S.Ct. 706, 721, 102 L.Ed.2d 854 (1989) and may stigmatize through the reinforcement of pernicious, if common, stereotypes. *University of California Regents v. Bakke*, 438 U.S. 265, 298, 98 S.Ct. 2733, 2752, 57 L.Ed.2d 750 (1978). If one insists that the need for a greater number of whites in CRHA's public housing *must* override the mandate to avoid discrimination (in this case, discrimination

*politan Life. Ins. Co.*, 409 U.S. 205, 209–10, 93 S.Ct. 364, 366–67, 34 L.Ed.2d 415 (1972). The court agrees that a duty to integrate rests upon CRHA and the court commends defendant for its sensitivity to the import of that duty and for its intent to craft a policy which will fulfill that duty and take steps for the goal of "promoting stable, racially integrated housing." *Linmark Assoc.*, 431 U.S. at 94, 97 S.Ct. at 1619. However, this court is not persuaded by what CRHA has alleged to be the scope and strength of that duty. That is, this court does not find that the duty to integrate will necessarily override the duty to avoid discrimination. The court accepts CRHA's core claim that it is under the duty to integrate, but it finds legally impermissible the method through which CRHA has tried to fulfill this duty.

In large part, the court believes that the legal deficiencies of CRHA's race conscious tenant selection plan are the result of conceptual errors on the part of CRHA. First, CRHA has misassessed the relative strength and preeminence of the duty to avoid discrimination in relation to the duty to integrate. Second, the plan of CRHA does not fully take into account the way in which legal principles may come into conflict without either principle being extinguished or cast aside. The legislative history of the Fair Housing Act suggests to this court that the prime focus or the "quickening" force behind that legislation is prohibition of discrimination in the provision of housing, but also that integration was seen by the creators of that legislation as a prominent goal and a value of great worth. From the perspective of over two decades, it is perhaps excusable to find the unexamined assumption in the Act's legislative history that the principles of nondiscrimination and integration will always necessarily go hand in hand. With our later perspective, that assumption may be unfounded, but it does not detract from the observation that this legislation was created with both legal (and moral) principles in mind, although primary weight is given to the prohibition of discrimination. However, cases such as *Trafficante* illustrate that the legal principle of integration and concern for the achievement of that goal cannot be considered mere surplusage.

The specific policy of CRHA which is at issue before this court is a classic example of the possible conflict between the principles of nondiscrimination and integration. These legal values of nondiscrimination and integration are like the moral values which spawned them in that the two principles are not either necessarily or always fully congruent.[11] Conflicts between moral principles produce moral dilemmas. Structurally this legal dilemma is similar, as two

---

against blacks), then, to some extent, CRHA stigmatizes its present tenants and the blacks on the waiting list. A more thorough integration of CRHA's housing may very well be a boon both to residents and to the community at large, for the reasons spelled out in cases like *Trafficante* and *Linmark Assoc., Inc.* Yet, to violate the rights of potential black residents by granting preferential treatment to white applicants, in this court's view, casts a certain stigmatic shadow over both present and future black tenants. This is why the claim by CRHA, discussed *infra*, that their preferential plan is remedial, causes this court no small measure of concern. A plan which discriminates against the past victims of discrimination seems to turn on its head the concept of "remedial" plans, unless one accepts certain suppositions about the effect of the racial composition of the CRHA which partake of the very sort of stigmatic views which this court finds to be objectionable. Without question, this court appreciates the benefits which accrue from integration. Yet, if behind the strong insistence of CRHA that its preferential plan is necessary for the viability of its housing lies the implicit suggestion that an all black housing constituency is somehow a more enfeebled community, this court must reject any suggestion which contains such a stigmatization.

**11.** What the British playwright Tom Stoppard observed about moral principles may well hold for legal principles as well: "There would be no moral dilemmas if moral principles worked in straight lines and never crossed each other." The *Supreme Court* recently took note of a perennial conflict between the values of process and the values of results when it observed, "In this case, we confront once again the tension between the Fourteenth Amendment's guarantee of equal treatment to all citizens, and the use of race-based measures to ameliorate the effects of past discrimination on the opportunities enjoyed by members of minority groups in our society." *City of Richmond v. J.A. Croson Co.*, — U.S. —, 109 S.Ct. 706, 712, 102 L.Ed.2d 854 (1989).

adequately grounded, potent legal principles cross lines to present CRHA with its dilemma: Can it integrate without discriminating or must the policy of nondiscrimination produce *de facto* segregation? This problem is similar in structure to a moral dilemma because there is no question that CRHA is under an obligation to avoid discrimination and there can be little doubt that integration is an appropriate, and laudable, policy goal for CRHA to pursue. However, CRHA has chosen to implement this appropriate policy goal through inappropriate means. In the present conflict between these two legal principles, nondiscrimination and integration, the obligation of CRHA to avoid discrimination must "trump" CRHA's obligation to promote integration, as regards the promotion of integration through the specific policy mechanism in controversy before this court. It is not that this court ascribes to integration a status inferior to nondiscrimination in the pantheon of legal values. It is, rather, that the duty to avoid discrimination must circumscribe the specific particular ways in which a party under the duty to integrate can seek to fulfill that second duty. Once again, this court has recourse to the statutory statement of policy, where it is clear that policy for the provision of fair housing is a policy which must be implemented "within constitutional limitations." 42 U.S.C. § 3601.

When this court identifies a conceptual error on the part of CRHA, it does so because of defendant's error in developing its mechanism to meld the two competing legal principles. In part, the policy of CRHA fails to distinguish between the way one legal principle, integration, functions as a goal and the way the other, nondiscrimination, functions as a constraint. While the legal value of nondiscrimination could certainly function in certain settings as a policy goal, it is clear from both the policy statement, 42 U.S.C. § 3601, and the statutory sections which bar discrimination in the provision of housing, 42 U.S.C.

§ 3604(a)–(d), that the principle of nondiscrimination functions here as such a constraint, as a limit or a wall circumscribing what actions an actor may take.[12] In a recent concurring opinion, Justice Scalia has described the result of a conflict between a legal principle as a goal and such a constraint when he writes, "The benign purposes of compensation for social disadvantages, whether they have been acquired by reason of prior discrimination or otherwise, can no more be pursued by the illegitimate means of racial discrimination than can other assertedly benign purposes we have repeatedly rejected." *City of Richmond v. J.A. Croson,* —— U.S. ——, 109 S.Ct. 706, 735, 102 L.Ed.2d 854 (1989) (Scalia, J., concurring). As with moral principles, legal principles conflict because they do not "run in straight lines" and because they are not all fully commensurable or congruent.

This court finds that when this point of incongruence is encountered in the present case, the principle of nondiscrimination has lexical priority over the principle of integration. Since the present policy does discriminate against black applicants for housing, the court finds this particular policy to be impermissible and so must give priority to the principle of nondiscrimination over the particular incantation of integration which is found in the policy at question. However, merely because this particular policy is impermissible, CRHA cannot discard its duty to pursue the goal of integration, although that goal must be pursued through policies which do not involve discrimination. While the scope of this policy advancing integration must be circumscribed, that does not mean that the legal principle of integration goes away, that CRHA's duty to seek integration fades away, or that the legal value of integration has no force.

To utilize an analogy from moral philosophy, when one describes the conflict of moral principles, it is not accurate to act as

---

**12.** As will be obvious when the court discusses *infra* the conditions under which some sort of race-conscious discriminatory programs might pass muster, this wall of circumscription may seem at times to be serpentine, yet it is still a wall and one which excludes the policy in question.

if the principle which has been overridden evaporates without residue. A principle, even after being overridden, still has some force. It still leaves, in one philosopher's language, "moral traces." *See* Nozick, Moral Complications and Moral Structures, 13 Natural L. Forum 1 (1968). A moral principle which has been overridden still commands some allegiance. Even if it is not the determinative principle in a given moral dilemma, it is still a moral consideration of which the moral agent must take account. It is imperative to note that this court is not absolving CRHA of its (circumscribed) duty to integrate nor is the court in any way denigrating the prominence of the principle of integration. Rather, this court finds that the mandate to avoid discrimination must immure the range of acceptable policy choices embodying the principle of integration. The specific method by which CRHA has opted to promote integration runs afoul of the injunction to avoid discrimination and so that method cannot pass muster, but the mandate to promote integration does continue as an obligation which CRHA must meet, within the metes and bounds defined by the prohibition against discrimination.

CRHA is accurate when they observe that other race-conscious methods have been utilized and approved by courts. Memorandum in Support of Defendant's Motion For Summary Judgment at 16. This observation by CRHA is true, but is ultimately not sufficient to defend their present policy because just as the resolution of a moral dilemma of two principles in conflict will depend upon the relative pull of each of those two principles as applied within the situation in question, the dilemmatic character of the legal question before this court is shaped by the particular contours of the specific legal instrument or policy which is a vehicle for the legal principles in question. Thus, there are situations where the principle of integration can be vindicated because it is formulated through a policy whose effects are not in conflict with the legal principle of nondiscrimination. Finally, as the analogy of the concept of "moral traces" will illustrate, even though the legal principle of nondiscrimination must mean that the present policy of CRHA is impermissible, the value of integration is one of which CRHA is obligated to take account in some fashion, for its "traces" still remain and have force over the defendant.

C.

■ Undoubtedly, there can be circumstances where the legal dilemma is resolved by having the principle of integration coexist with or impinge upon the principle of nondiscrimination. Preferential treatment plans can pass legal muster under certain well-defined criteria. However, because these criteria are well-defined and quite limited, the principle of integration impinges upon the principle of nondiscrimination in only a very limited way, and to an extent far more limited than is involved in the present policy of CRHA. A race-conscious preferential policy could survive legal scrutiny if it is narrowly tailored, remedial in character, and temporary in duration. *Starrett City*, 840 F.2d at 1102–03.

■ Defendant's claim that its policy is remedial is problematic for two reasons. First, the policy seeks to remedy past discrimination against blacks in Charlottesville seeking housing with more discrimination against blacks. An expert witness for the defendant testified that "there are limited housing opportunities available to minorities elsewhere, due in large part to continued discrimination...." Newman, Affidavit at 29–30. Thus, a policy which made less housing available to blacks in Charlottesville would seem to exacerbate the plight of victims of past discrimination. Also, in support of its claim that the policy is remedial in character, defendant identifies societal discrimination against blacks as the wrong which the policy addresses. Answer of Defendant, ¶¶ 11, 12, and 13. This court does not dispute, and in fact readily concedes, defendant's claim that blacks in Charlottesville have historically been the victim of such discrimination in the past, in housing as well as in other areas. This legacy of discrimination is a sad and regrettable part of our heritage

and forms a rationale for policies which seek to redress that wrong. However, the claim by defendant of generalized, societal discrimination is not, standing by itself, legally sufficient.[13] The Supreme Court has demanded something more than the amorphous or diffuse claim of generalized, background discrimination in order to justify rigid, discriminatory quotas. *J.A. Croson Co.*, 109 S.Ct. at 724. The race-conscious tenant assignment plan of CRHA thus does not meet the criterion of a remedial plan since the factual predicate for such a remedy has not been established with sufficient particularity and, more distressingly to this court, since the plan discriminates against black applicants in favor of white applicants, this plan compounds past discrimination against blacks with continued discrimination, in the form of delays in obtaining public housing for which they would be otherwise eligible.

As part of its justification for the assertion that the plan is remedial, CRHA points to what it alleges are the great needs in the white community of Charlottesville for public housing. Memorandum in Support of Defendant's Motion for Summary Judgment at 4. CRHA cites statistics which purport to show that there is both a higher percentage of whites who need public housing and a larger absolute number of whites who need public housing than blacks. CRHA has yet adequately to explain why that white constituency, if it is as needy as CRHA alleges, is so thoroughly underrepresented on the lists of applicants for public housing. However, even if this great unfulfilled need exists among that constituency in Charlottesville, the absence of whites on the waiting list for public housing in Charlottesville clearly demonstrates that that constituency does not perceive itself as having that need.[14]

■ Neither can the specific plan for tenant assignment adopted by CRHA be considered as a narrowly tailored remedy, since all of the otherwise eligible black applicants ahead of white applicants in the queue for public housing are affected, even injured, as a result of the serious delays which are forced upon them by the preference given to white applicants. A narrowly tailored remedy is one which produces ripples as small as possible and which is

**13.** In one of the seminal cases on this issue, the Supreme Court held that

> No one doubts that there has been serious racial discrimination in this country. But as the basis for imposing discriminatory *legal* remedies that work against innocent people, societal discrimination is insufficient and over expansive. In the absence of particularized findings, a court could uphold remedies that are ageless in their reach into the past, and timeless in their ability to effect the future.

*Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 276, 106 S.Ct. 1842, 1848, 90 L.Ed.2d 260 (emphasis in original), *reh. den.*, 478 U.S. 1014, 106 S.Ct. 3320, 92 L.Ed.2d 728 (1986).

**14.** This court does not undertake to dispute here the veracity of the statistical picture presented by CRHA regarding the needs for public housing in the white community in Charlottesville. However, this court finds it more difficult to take this statistical picture as evidence of a crisis or an alarming situation when the very people to whom this need is imputed not only do not act to remedy this need, but do not act in any way as if they perceived that such a need exists among them. This argument by CRHA puts it in the position of the paternalist social engineer who tells the given constituency what they need and then tells them that they, though presumably competent adults, need a given commodity even though they do not feel that need or perceive that they have such a need. Such a paternalistic posture, in addition to being offensive to the dignity of those to whom this need is imputed, overlooks the very practical problem of constructing a policy which will effectively meet this alleged need when the need is either not perceived or even deliberately ignored by the constituency in question. Even if, in abstract terms, this need for public housing among the white population of Charlottesville is real, CRHA has yet to demonstrate how its plans will convince the white community of its own public housing needs and then, short of some sort of coercive feature, induce them to act upon those needs. The problem of inducing them to act upon this need and seek public housing is akin to the problem of a lack of interest among certain baseball fans, a problem so acutely described by Yogi Berra when he said, "If the people don't want to come out to the ballpark, nobody's going to stop them." If the white community in Charlottesville who formally meet the criteria for eligibility for public housing do not perceive public housing as a need or as an option which is viable to them, and if they do not want to put their name on the list of applicants for public housing, "Nobody's going to stop them."

circumscribed in its effect on innocent parties. The remedy in question here would have a serious impact upon every black applicant for public housing in Charlottesville, both present and future applicants.

 Finally, despite defendant's claims, this court is not convinced that the plan can fairly be labeled as temporary. Defendant claims that "Once the waiting list changes over a period of time to reflect the true needs of the community for public housing as reflected in the 1980 Census data, then the preference would be entirely eliminated." Memorandum in Support of Defendant's Motion for Summary Judgment at 7. The identification of what could count as either the "true needs" or the fulfillment of those needs would inevitably be a thoroughly wooly and vague process. Since the identification of those needs is so vague, this court fears that any plan administrator would be at a loss to be able to describe when the point for the termination of the plan would be reached.[15] Furthermore, CRHA offers no probative evidence that such a plan, if it remained in effect, would actually induce the state of affairs prayed for by defendant, and this lack of evidence casts doubt that this plan could really be temporary.

### IV.

This court finds that the race conscious, preferential tenant assignment of defendant CRHA violates 42 U.S.C. § 3604(a)–(c) and directs defendant to cease the implementation of that plan. The United States has submitted a detailed proposed order which would involve the court in the minutiae of CRHA's activities. The court declines to enter that order or any order which would put the court in the position of "micro-managing" an on-going institution, particularly where no evidence has been offered to prove, or tending to prove, that CRHA will fail in any way to follow the law as this court has stated it. Factually, the evidence clearly demonstrates a sincere effort on the part of CRHA to administer its programs in what it conceived to be the proper way. That CRHA was in error in enforcing the policy in question in no way denigrates that sincerity. Thus, the court finds no basis for imposing on CRHA a somewhat draconian decree by which the court in effect structures the management and operation of CRHA. Rather, defendant CRHA is directed to shape its policies in a way consonant with this opinion and order.

Thus, this court denies defendant's motion for summary judgment and grants plaintiff's motion for summary judgment, insofar as this court finds defendant's tenant assignment plan to be an example of impermissible discrimination.

An appropriate Order shall this day issue.

---

**15.** While the plan envisioned a certain racial mix as the target for termination of the plan, if one takes seriously the sententious imperative about meeting the "true needs" of the community, such a course might well serve as an attempted justification for a range of Procrustean programs.