Sue B. O'NEAL, by her brother and next friend, Coleman BOYD; Esther Thrailkill, by her son and next friend, John G. Thrailkill, Plaintiffs

v.

ALABAMA DEPARTMENT OF PUBLIC HEALTH; Claude Earl Fox, individually and in his official capacity as State Health Officer, Alabama Department of Public Health; Quality Living, Inc., an Alabama corporation, Defendants.

Civ. A. No. 92-D-633-N.

United States District Court,
M.D. Alabama, N.D.

June 22, 1993.

W. Wayne Sabel, Montgomery, AL, for plaintiffs.

Patricia E. Ivie, AL Dept. of Public Health, Montgomery, AL, for defendants AL Dept. of Public Health and Fox.

Edward Still, Birmingham, AL, for defendant Quality Living.

## MEMORANDUM OPINION

DE MENT, District Judge.

Now before the court is defendants' motion for partial summary judgment, filed December 14, 1992. The plaintiffs responded January 8, 1993. Jurisdiction is proper under 28 U.S.C. § 1331. Personal jurisdiction and venue are uncontested.

## FACTS

Plaintiff Sue B. O'Neal, an 82–year–old woman, and plaintiff Thrailkill, and 88–year–old woman, both have Alzheimer's Disease. Defendant Quality Living,[1] managed by Ms. Leonore Cooper[2], is an "assisted living facility." Quality Living, and other facilities like it, meet the needs of those persons who have

---

**1.** Quality Living is a nominal defendant. Its interests are not adverse to those of the plaintiffs. For convenience, the court will refer to the state defendants as "defendants" as though they were the only parties so named.

**2.** Ms. Cooper is not a defendant.

disabilities serious enough to prevent them from living by themselves but not so serious as to require the professional services which a full-fledged nursing home would provide. Both plaintiffs currently live on the premises of defendant Quality Living.

In 1990, defendant Alabama Department of Public Health ("Department") inspected Quality Living in order to determine whether the facility could be licensed.[3] The Department determined that it could not and initiated administrative proceedings to revoke Quality Living's license. One of the reasons given for the revocation was the presence of Ms. O'Neal. According to the Department, she was confused as to time and place, unable to self-administer her medication and could not exit the facility in an emergency. The administrative hearing officer recommended that Quality Living's license be revoked and defendant Claude Earl Fox[4], as State Health Officer and head of the Department of Health, issued an administrative order revoking the license.

Quality Living appealed the revocation to the Montgomery County Circuit Court. In February 1992, the parties settled the matter. Ms. Cooper agreed to evict Ms. O'Neal in order to retain her license.

Chapter 420 of the "Rules of the Alabama Department of Public Health," governs the inspection, operation and licensing of these group homes. Chapter 420 states that an "assisted living facility" is

> a permanent building in which room, board, meals, laundry and assistance with personal care and other services are provided ... to a minimum of two ambulatory adults not related by blood or marriage to the owner and/or administrator....

Ala.Admin.Code, § 420–5–4.01(2)(k).

The regulations further state that an "assisted living facility shall confine its services to persons who are not in need of hospital or nursing care." Ala.Admin.Code § 420–5–4.03(1)(b). A resident must be "fully aware of his/her medication" in order to "remain at the facility" and must not have a "chronic health condition requiring extensive nursing care and/or daily medical supervision ... or observation," must not need special care for mental illness and must not display "symptoms of severe senility." Ala.Admin.Code, 420–5–4.08.

## DISCUSSION

According to plaintiffs, defendant Department has violated the Fair Housing Act ("Act"), as amended, 42 U.S.C. § 3604(f) and the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq., by refusing to allow plaintiffs to live in the housing of their choice.

In 1988, the Congress overhauled the Fair Housing Act. Before 1988, the statute prohibited discrimination in housing on the basis of "race, color, religion or national origin." The amended statute, which took effect on March 12, 1989, prohibits discrimination on the basis of "familial status" or "handicap" as well. The amended Act now states that "[i]t shall be unlawful

> to discriminate against any person in the terms, conditions or privileges or sale or rental of a dwelling, or in the provision of services or facilities in connection with such a dwelling because of a handicap of that person ..."

42 U.S.C. § 3604(f)(2).

The statute further defines discrimination as including:

> a refusal to permit, at the expense of the handicapped person, reasonable modifications of existing premises occupied or to be occupied by such person ... [or] a refusal to make reasonable accommodations in rules, policies, practices, or services when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling.

42 U.S.C. § 3604(f)(3)(A), (B).

---

**3.** Quality Living had received a temporary license. This hearing was to determine whether Quality Living should be issued a permanent license.

**4.** Dr. Fox no longer holds this position. The new State Health Officer is Donald E. Williamson. Although he is not a defendant in his official capacity, Dr. Fox remains a defendant in his personal capacity.

Both parties agree that the plaintiffs are persons with handicaps within the meaning of 42 U.S.C. § 3602.[5]

The ADA, enacted in 1990, was designed, in part, to "elimin[ate] discrimination against individuals with disabilities," and to "provide clear, strong, consistent and enforceable standards addressing discrimination against individuals with disabilities." 42 U.S.C. § 12101(b).

The parties disagree upon the status of the plaintiffs under the ADA. Both parties agree that Ms. Thrailkill and Ms. O'Neal are "individuals with disabilities," as defined by the ADA. 42 U.S.C. § 12102(2). However, the state defendants dispute plaintiffs' contention that they are *"qualified* individuals with disabilities" as defined by the statute.[6]

Defendants have moved to dismiss each plaintiffs' claims. They have also, in the alternative, moved for summary judgment on the issues of punitive damages. Defendant Fox argues that he is entitled to qualified immunity.

### A. *Ripeness*

■ Defendants first move to dismiss plaintiff Esther Thrailkill's complaint, arguing that it is not ripe for disposition because the state has taken no action against her. Ms. Thrailkill currently resides at Quality Living. According to the defendants, although Ms. Thrailkill at one time may have been ineligible to stay at Quality Living, she currently meets all eligibility criteria. Plaintiff Thrailkill insists that defendants' agent, Ms. Stella Camp, determined prior to this lawsuit that Ms. Thrailkill was not eligible to remain at Quality Living—an action which prompted Ms. Thrailkill to file this suit.

■ The Supreme Court has observed that

the judicial power of federal courts is constitutionally restricted to 'cases' and 'con-

troversies.' ... In part those words limit the business of federal courts to questions presented in an adversary context and in a form historically viewed as capable of resolution through the judicial process.

*Flast v. Cohen,* 392 U.S. 83, 94–95, 88 S.Ct. 1942, 1949–50, 20 L.Ed.2d 947 (1968).

Thus, there must be a "substantial controversy, between parties having adverse interests, of sufficient immediacy and reality," to warrant judicial intervention. *Id.* Thus, when the plaintiff's injury has not yet occurred but is merely speculative, the dispute is not ripe for decision. However, when enforcement of a law or regulation is imminent, the courts have allowed plaintiffs to proceed with litigation, rather than requiring them to continue to break the law and suffer the consequences. *See, e.g.,* C. Wright & A. Miller, *Federal Practice and Procedure,* § 3532.5.

Here, assuming the facts are as the plaintiff says they are, it appears that Ms. Thrailkill's eviction, like Ms. O'Neal's, is imminent. Ms. Cooper apparently believes that her continued licensing depends upon getting the plaintiffs out of her facility and she has taken steps toward accomplishing that end. *See* Deposition of Coleman Boyd, Ex. 2. The court finds that Ms. Thrailkill's injury is sufficiently ripe for adjudication.

This conclusion is bolstered by the Act itself. The statute in question defines "aggrieved person" as a person who—

(1) claims to have been injured by a discriminatory housing practice; or

(2) believes that such person will be injured by a discriminatory housing practice which is about to occur.

42 U.S.C. § 3602(i).

At the very least, Ms. Thrailkill would fall into the category of persons described in section 3602(i)(2).

---

**5.** The Act defines "handicap" as follows:
Handicap means with respect to a person—
  (1) a physical or mental impairment which substantially limits on or more of such person's major life activities;
  (2) a record of having such an impairment
  (3) being regarded as having such an impairment.
42 U.S.C. § 3602(h).

**6.** Section 12131 reads, in part:
A qualified individual with a disability means an individual with a disability who, with or

without reasonable modifications to rules, policies, or practices, the removal of architectural, communication or transportation barriers or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities.
42 U.S.C. § 12131.
  The ADA also defines "qualified individual with a disability" in terms of employment discrimination. 42 U.S.C. § 12111(8).

The Seventh Circuit reached a similar conclusion in *Gorski v. Troy,* 929 F.2d 1183 (7th Cir.1991). In that case, a couple had attempted to qualify as foster parents but had not yet been licensed when their landlords evicted them. The landlords stated that they didn't want "that sort of thing going on." *Id.* at 1185 n. 2. After noting that the Act prohibits discrimination on the basis of "familial status," the *Gorski* court held that the plaintiffs had standing to challenge their landlords' discriminatory acts as persons who "believe that such person will be injured by a discriminatory practice that is about to occur," even though they had not yet become foster parents. *Id.* at 1190. *See also Seniors Civil Liberties Ass'n v. Kemp,* 761 F.Supp. 1528 (M.D.Fla.1991), *aff'd* 965 F.2d 1030 (11th Cir.1992) (permitting challenge to Act before attempts at enforcement had occurred).

■ If, on the other hand, what defendants claim is true—that Ms. Thrailkill is currently eligible to remain in an assisted living facility, although her condition previously was questionable—she still has standing. In a line of cases, originating in 1911, the federal courts have recognized that certain controversies are capable of repetition yet evade review. *See* C. Wright & A. Miller, *Federal Practice & Procedure,* § 3533.8 (1991). For example, when a governmental agency voluntarily ceases its enforcement efforts against a plaintiff who challenges its actions, thereby mooting the immediate controversy, it is possible for the agency to resume enforcement against once the case is dismissed, thereby avoiding a judicial resolution of the legality of its actions. Three elements must be present in order for the court to apply this doctrine: the repetition of the acts which gave rise to the litigation must be likely; the probability that an effective remedy cannot be provided if the repetition occurs must be high; and the same plaintiff must be affected by the predicted repetition. *Id.*

Ms. Thrailkill is a near perfect example of the type of plaintiff whom the doctrine was designed to protect. The state has made its position clear—anyone who does not meet the eligibility requirements must leave. If, as it appears, Ms. Thrailkill's condition varies from month to month, sometimes improving to the point where she is eligible to live at Quality Living, sometimes declining to the point where she needs more extensive medical treatment, it may be impossible for her to mount a challenge to the state regulations within the window of opportunity.

Based on this reasoning, the court finds that Ms. Thrailkill has standing to bring this lawsuit. Therefore, the court finds that defendants' motion is due to be denied.[7]

## B. *Laches/Statute of Limitations*

■ Defendants also argue that Ms. O'Neal's claims are time-barred—either by the doctrine of laches or because the statute of limitations has run. Plaintiffs argue that they filed this action as soon as they were aware that an injury had accrued.

A brief recital of the facts is necessary in order to understand the parties' contentions. In 1990, the Department of Public Health first attempted to revoke Quality Living's license. Among the reasons given for the attempted revocation was the presence at the facility of residents who were unable to medicate themselves and who required more care than the facility could give them. An administrative hearing was held February 22, 1990 in order to determine whether Quality Living could remain licensed. Mr. Boyd testified about his sister's condition at that hearing. The decision of the administrative panel was appealed to the Montgomery County Circuit Court. Mr. Boyd also testified before the circuit court on behalf of Quality Living. Ms. O'Neal did not try to intervene in those proceedings, even though such an option was arguably open to her. The parties settled the suit on February 24, 1992. One of the items to which the parties agreed in the settlement was that Ms. O'Neal would leave Quality Living. *See* Defendants' Ex. A. As a result of the settlement, Quality Living, through its manager, Ms. Cooper, informed

---

7. The previous discussion assumes that Mr. Boyd and Mr. Thrailkill are the legal guardians of the women they purport to represent.

Mr. Boyd that he would have to make other arrangements. *See* Affidavit of Coleman Boyd, Ex. 1. He attempted to appeal this decision but was informed that the Alabama Administrative Procedures Act provided no mechanism for appeal. As a result, he filed this action.

The doctrine of laches is raised as a defense to an action in equity. It is intended to prevent the litigation of stale claims and is properly asserted when one party's inexcusable delay in bringing a claim has unduly prejudiced the ability of the other party to defend itself against the claim. *See, e.g., CSX Transportation, Inc. v. City of Thorsby,* 741 F.Supp. 889, 892 (M.D.Ala.1990).

Defendants also claim that the statute of limitations began to run in 1990 when Mr. Boyd testified at the administrative hearing.[8] The Act provides for a two-year statute of limitations. *See* 42 U.S.C. § 3613(a)(1)(A).[9]

The court finds that neither theory serves to bar Ms. O'Neal's action. While her brother and next friend did testify at the administrative hearing, all of the facts before the court indicate that the scope of the hearing was limited. *See* Plaintiffs' Ex. C. Had Mr. Boyd attempted to bring his Fair Housing Act claims to the attention of the tribunal, it appears that it would have been futile. The same is true of the suit in the circuit court. *See* Plaintiffs' Ex. E.

Moreover, the judgment ordering Ms. O'Neal to leave Quality Living could not have become final until the circuit judge heard the appeal and issued his final order, or, as actually happened, the parties settled the matter. *See* Plaintiffs' Ex. D. On February 26, 1992, Mr. Boyd received the letter notifying him that his sister would have to leave. Even assuming that Mr. Boyd paid close attention to and was kept informed about the progress of the hearing and subsequent appeal, it would not be reasonable to require him to file this suit before he learned of the result reached in the circuit court suit.[10] Based on the foregoing, the court finds defendant's motion is due to be denied.

## C. *Damages*

■ Defendants argue that plaintiffs' claims for damages are due to be stricken as a matter of law because they have suffered no compensable injury and also because defendants have not acted toward plaintiffs with the intent necessary to justify an award of punitive damages. They note that plaintiffs' actual damages are slight, as they have not yet been evicted from Quality Living by the state.

Based upon its reading of plaintiffs' brief, it appears to the court that the plaintiffs more or less concede the issue of compensatory damages, although they argue that they are entitled to nominal damages for the loss of their civil rights. Plaintiffs' Brief in Opposition to Defendants' Motion to Dismiss at 11–14. However, plaintiffs maintain that they are entitled to punitive damages.[11] They argue that since the specific provision of the Act which prohibits discrimination on

---

**8.** Defendants argue that the proper statute of limitation is two years. The plaintiffs do not dispute this contention. Because the court finds that plaintiffs filed this action within a matter of months after the events which gave rise to this lawsuit occurred, it does not reach this issue.

**9.** The ADA does not specifically limit the time within which an action must be brought. However, the effective date of the act was eighteen months after its enactment on July 26, 1990. Thus, Ms. O'Neal could not have brought any claim under the ADA until January 26, 1992.

**10.** Indeed, had he filed this suit on behalf of Ms. O'Neal before it was clear that she would have to be evicted, there is a strong possibility that the suit would have been dismissed because the controversy would not have been ripe.

**11.** As defendants correctly observe, the remedies permitted by the ADA are the same as those provided by section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, as amended. The damages available under section 504 are the same as those available for a violation of Title VII. *See Lengen v. Department of Transportation,* 903 F.2d 1464, 1468 (11th Cir.1990).

However, as plaintiffs note, the ADA, Title VII, and the Rehabilitation Act have all been amended by the Civil Rights Act of 1991, 42 U.S.C. § 1981a, to enable plaintiffs to recover money damages. Also, in the ADA, the Congress specifically abrogated the states' Eleventh Amendment immunity from money damages. 42 U.S.C. § 12202. This would enable plaintiffs recover from the state whatever damages they would be able to recover from any other defendant.

the basis of disability has been in force since 1989, defendant Fox, as the senior official in charge of the state's Department of Public Health, must have known that his actions would violate the statute. They argue that Fox's lack of concern for his federally mandated obligations can only be construed as deliberate indifference to plaintiffs' rights.[12]

The court believes that the plaintiffs' interpretation of the intent requirement collapses the distinction between discriminatory intent, the minimum for showing a violation of the statute, and the recklessness or callous disregard of plaintiffs' rights which justifies a punitive damages award. In order to prove a violation of the Act, the plaintiff must demonstrate that the defendant's discrimination was intentional. This is not usually a heavy burden, as it is not necessary to show that the defendant acted out of malice or ill will or even that the defendant was solely motivated by a proscribed animus—it is sufficient to show that the discrimination was meant to occur and that it occurred. *See United States v. Scott*, 788 F.Supp. 1555, 1562 (D.Kan.1992) (citations omitted).[13] In fact, the defendant's alleged good intentions are no defense where the discrimination actually took place. *Id.*

■ On the other hand, in order to justify an award of punitive damages, the law requires the plaintiff to demonstrate that the defendant acted with a more malevolent intent. At the very least, the plaintiff must show that the defendant was recklessly or callously indifferent to the federally protected rights of others. *See, e.g., Smith v. Wade,*

461 U.S. 30, 56, 103 S.Ct. 1625, 1640, 75 L.Ed.2d 632 (1983) (discussing section 1983 civil rights claims); *United States v. Scott,* 809 F.Supp. 1404, 1407 (D.Kan.1992) (applying *Smith v. Wade* standard to Fair Housing Act case). The reporters are, unfortunately, replete with cases in which the defendants treated the plaintiffs callously and were obviously motivated by prejudice and ill-founded fears. *See, e.g., Matchmaker Real Estate,* 982 F.2d at 1099–1100 ("blatant" racial steering); *Littlefield v. McGuffey,* 954 F.2d 1337, 1341 (7th Cir.1992) (defendant landlord stalked, intimidated, and threatened interracial couple and family); *Tolliver v. Amici,* 800 F.2d 149, 151 (7th Cir.1986) (defendant stated she would never rent to a black person).

Whereas a defendant's good intentions are irrelevant when determining whether the Act has been violated, his or her motivations are more important when considering punishment.[14] Certainly the law provides that a real estate agent who refuses to show African–American homebuyers certain houses, or a landlord who tells certain people an apartment is unavailable, or a group of citizens who band together in order to keep people who are considered "undesirable" out of their neighborhood have committed acts which merit punishment. However, it does not follow that the director of a state health agency, charged with the dual responsibility of ensuring the safety of the disabled and with ensuring that the disabled are allowed to live the fullest lives of which they are capable, should

---

12. According to the plaintiffs, an agent of the Department, Ms. Stella Camp, told the staff at Quality Living that Ms. Thrailkill and Ms. O'Neal did not belong at the facility and that they should go live "wherever confused, wheelchair-bound people live." Affidavit of Lee Cooper. The court agrees that the alleged remark is callous and that, at the very least, it demonstrates a lack of tact. However, the fact that an agent of the state defendants made this remark does not justify the imposition of punitive damages against the principals without a showing that they ratified the agent's conduct. *See City of Chicago v. Matchmaker Real Estate Sales Center, Inc.,* 982 F.2d 1086, 1099–1100 (7th Cir.1992) (overturning trial court's award of punitive damages against owners of real estate sales office where plaintiffs offered no evidence of ratification of agents' "blatant" racial remarks).

13. As one court has noted:

> A person who attempts to prevent a black family from buying the house next door because the presence of a black family on the block will lower property values violates the Fair Housing Act just as assuredly as a person who attempts to prevent a black family from buying the house next door because that person dislikes all black people.

*United States v. City of Birmingham,* 538 F.Supp. 819, 830 (E.D.Mich.1982) (subsequent history omitted).

14. If plaintiffs were correct, whenever a defendant was not entitled to qualified immunity, he or she would have to pay punitive damages.

be punished for allegedly getting the balance wrong.

The situation before the court is somewhat analogous to that found in *United States v. Starrett City Associates*, 840 F.2d 1096 (2d Cir.1988), in which the managers of a housing project used racial quotas to preserve racial integration in their housing complex. The defendants wanted to mitigate the effects of "white flight," by reserving a certain number of apartments for whites. As a result of this policy, minority applicants were forced to wait up to ten times longer for an apartment. The *Starrett City* court acknowledged as worthy the managers' goals, but nonetheless found that their actions violated the Act. The court granted injunctive relief, but did not apparently award damages. *Id.* at 1097. *See also South–Suburban Housing Center v. Board of Realtors*, 935 F.2d 868, 882 (7th Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 971, 117 L.Ed.2d 136 (1991) (discussing tension between goals of integration and nondiscrimination); *United States v. Charlottesville Redevelopment & Housing Auth.*, 718 F.Supp. 461 (W.D.Va.1989) (discussing a policy similar to that in *Starrett City* ).

Here, the Department is caught between the competing goals of state and federal law. The ADA and the Fair Housing Act seek to end the isolation and segregation of individuals with disabilities by ensuring them equal treatment or reasonable accommodation. The state of Alabama's licensing statute requires the Department to "promote the public health, safety, and welfare by establishing standards for the treatment and care of individuals in institutions," such as assisted living facilities. Ala.Code § 22–21–21 (1975). While one might hope that these interests would never be at odds with each other, this case demonstrates that, at least in some circumstances, it is not always so. In fact, one can imagine that had the state adopted a regulation which allowed persons such as the

plaintiffs to remain in a situation where their medical needs were perhaps inadequately met, a lawsuit challenging the state's dereliction of its responsibility to ensure the health of its citizens would result.

Given these factors, the court does not believe that the defendant's conduct in this instance rises to a level meriting the imposition of punitive damages. Accordingly, defendants' motion to strike the plaintiffs' claims for punitive damages is due to be granted.

### D. *Immunity*

■ Plaintiffs have sued Fox individually and in his official capacity as State Health Officer.[15] He argues that he is entitled to absolute immunity because he performed a judicial function at the time the events complained of occurred. He also claims that he is entitled to qualified immunity because the issues raised in this lawsuit are novel. Because the court finds that defendant Fox is entitled to qualified immunity, the court does not here decide whether he is entitled to absolute judicial immunity.

State officials are entitled to qualified immunity "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). This test is objective— the court must determine "whether a reasonable public official could have believed his or her actions were lawful in light of the clearly established law and in light of the information possessed by the official at the time the conduct occurred." *Stewart v. Baldwin County Board of Education*, 908 F.2d 1499, 1503 (11th Cir.1990). If a question of law is unsettled, the defendant is entitled to qualified immunity. *Daniel v. Taylor*, 808 F.2d 1401, 1403 (11th Cir.1986).[16]

---

**15.** *See supra* note 4.

**16.** Before the court can consider whether the defendant's activities violated clearly established law, the defendant must first show that he or she acted within the scope of his or her discretionary authority. *Zeigler v. Jackson*, 716 F.2d 847, 849 (11th Cir.1983). That is, he must show "objective circumstances which would compel the con-

clusion that his actions were undertaken pursuant to the performance of his duties and within the scope of this authority." *Rich v. Dollar*, 841 F.2d 1558, 1564 (11th Cir.1988) (citations omitted). It is apparent that Dr. Fox' role in this situation, whether it is characterized as quasi-judicial when he ruled on the appeal or executive, as when he carried out his statutory man-

Here, the court finds that defendant Fox is entitled to qualified immunity because he reasonably could have believed that his actions were lawful.[17] The Act prohibits a state from enacting any law which would require or permit a discriminatory housing practice. 42 U.S.C. § 3615. Notwithstanding the fact that the Act defines "discrimination," the precise contours of this term are not well developed. For example, the Act states that it is discriminatory to refuse to "make reasonable accommodations in rules, policies, practices and services, when such accommodations may be necessary to afford such a person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B). As centuries of jurisprudence have taught us, the word "reasonable" is subject to a wide variety of interpretations.

In fact, the court's research[18] indicates that there have been relatively few cases interpreting the Act which involve fact patterns similar to that currently presented to the court and those cases which are most similar to the instant case do not offer clear-cut guidance. For example, the Sixth Circuit has held that the defendant city violated the Act when it required a group home for the mentally retarded to install specialized safety equipment where the equipment was unnecessary and ill-suited to the needs of the residents. *Marbrunak, Inc. v. City of Stow,* 974 F.2d 43, 48 (6th Cir.1992). The *Marbrunak* court noted that the regulations were based upon "false and overprotective assumptions about the needs of handicapped people ..." *Id.* at 47.

On the other hand, in *Familystyle of St. Paul v. City of St. Paul,* 728 F.Supp. 1396 (D.Minn.1990), the court found that the defendant state's licensing requirements governing the administration of homes for the mentally disabled did not violate the Act, even though the regulations restricted the ability of the disabled to live where they chose. Also, in *Bangerter v. Orem City Corp.,* 797 F.Supp. 918 (D.Utah 1992), the court found that the city's refusal to license a group home for the developmentally disabled unless the managers assured the city that the residents would be supervised 24 hours a day did not violate the Act, even though this had the effect of restricting the housing choices of the handicapped. *See also Casa Marie, Inc. v. Superior Court of Puerto Rico,* 752 F.Supp. 1152, 1158 (D.P.R.1990) (plaintiff, an elder-care facility, was ordered to abide by state's licensing requirements).

Given the existing state of the law, the court finds that defendant Fox could have believed that his refusal to allow the plaintiffs to remain at Quality Living was lawful. As noted above, the law requires him to make reasonable accommodations. In the absence of authority to the contrary, the fact that defendant Fox did not consider reasonable the sole accommodation offered by the plaintiffs—their continued presence at Quality Living—does not remove from him the shield of immunity. Based on the foregoing, the court finds that defendant Fox is entitled to qualified immunity.

## CONCLUSION

The court finds that defendants' motion to dismiss is due to be denied. The court also finds that defendants' motion for partial summary judgment is due to be granted.

date, was taken pursuant to the performance of his duties as State Health Officer.

After the state official satisfies his or her burden, the burden shifts to the plaintiff to show the lack of good faith on the defendant official's part. *Id.* at 1565. In addition to demonstrating the defendant's bad faith, the plaintiff must also show that material issues of fact remain which preclude summary judgment.

**17.** The parties do not discuss the qualified immunity defense as it relates to the ADA. The statute took effect in 1992, only one month before the parties settled the state court action. The ADA was not in effect in 1990 when the state first noted that Ms. O'Neal should not continue to reside at Quality Living. Because of the novelty of the statute and the relative lack of case law discussing the statute and its implications, the court finds that the law of the ADA is not yet "clearly established" and that defendant Fox is entitled to qualified immunity.

**18.** The plaintiff does not point to any similar cases.