202 F.Supp.2d 938 (2001)
DARST-WEBBE TENANT ASSOCIATION BOARD, et al., Plaintiffs,
v.
SAINT LOUIS HOUSING AUTHORITY, et al., Defendants.
No. 4:99CV354 SNL.
United States District Court, E.D. Missouri, Eastern Division.
December 14, 2001.
Susan M. Alverson, Ann B. Lever, Daniel K. Glazier, Laura V. Brink, Legal Services of Eastern Missouri, St. Louis, MO, *939 for Darst-Webbe Tenant Ass'n Bd., Housing Comes First.
John J. Ammann, St. Louis University, St. Louis, MO, for Peabody Tenant Ass'n.
James C. Hetlage, Margaret M. Mooney, Lashly and Baer, P.C., St. Louis, MO, Bonnie Rivera, Robert A. Graham, Reno and Cavanaugh, Washington, DC, for St. Louis Housing Authority.
Wesley D. Wedemeyer, Office of U.S. Atty., St. Louis, MO, Harold J. Rennett, U.S. Dept. of Housing and Urban Development, Washington, DC, for Dept. of Housing and Urban Development, Andrew M. Cuomo, Mel Martinez.
James C. Hetlage, Margaret M. Mooney, Lashly and Baer, P.C., St. Louis, MO, for Cheryl A. Lovell.

MEMORANDUM OPINION
LIMBAUGH, Senior District Judge.
This case arises out of the proposed revitalization of the Darst-Webbe Family and Clinton Peabody public housing developments on the near south side of the City of St. Louis. Plaintiffs brought twelve counts (Counts I-XII) against the St. Louis Housing Authority(SLHA), and seven counts (Counts XIII-XIX) against the United States Department of Housing and Urban Development (HUD). The Court previously granted defendant HUD's motion for summary judgment on Count XIV, and the counts remaining against HUD are XIII and XV-XIX. Therefore, there are a total of eighteen counts remaining in this cause of action.[1]
*940 On March 30, 2001, all parties filed motions for summary judgment.[2] Plaintiffs filed a motion for partial summary judgment on Counts V, VII, X, XVI, and XIX of the Third Amended Complaint, defendant SLHA filed a motion for summary judgment as to Counts I-XII of plaintiffs Third Amended Complaint, and defendant HUD filed a motion for summary judgment on Counts XIII and XV-XIX. Plaintiffs filed nine volumes of exhibits to support their position on all three motions; SLHA filed its own exhibits to apply towards all three motions; and HUD has its exhibits in 20 separate binders filed in 10 boxes.[3] On June 19, 2001, the Court informed *941 the parties that it would take the three pending summary judgment motions with the case, and that the parties were not to file trials briefs with their pretrial material.
This case was then tried before the Court sitting without a jury on July 16-18, July 20, and July 23-24, 2001. The trial exhibits were identified in the same manner as the exhibits filed with the Court for the summary judgment motions, and the parties agreed not to file post trial briefs because the issues had been fully briefed in the summary judgment motions. This Court, having now considered the pleadings, the testimony of the witnesses, the documents in evidence, and the briefs filed for summary judgment along with the motions attached exhibits, hereby makes the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52.

FINDINGS OF FACT
Plaintiffs Darst-Webbe Tenant Association Board (DWTAB) and Peabody Tenant Association (PTA) are Missouri non-profit corporations and/or associations organized for the purpose of acting for and on behalf of the former residents of Darst-Webbe Family and the present residents of Clinton-Peabody public housing developments. Plaintiff Housing Comes First (HCF) is a Missouri non-profit corporation which engages in a variety of educational, informational, referral and advocacy activities to prevent homelessness and preserve affordable housing. Defendant Saint Louis Housing Authority (SLHA) is a Missouri municipal corporation, as well as a public housing agency (PHA) as defined by the United States Housing Act, 42 U.S.C. §§ 1437 et seq. Defendant, Cheryl Lovell, is the Executive Director of SLHA and, as such is responsible for the operation and administration of all the developments and programs of SLHA, including the administration of its HOPE VI and public housing programs. In addition, SLHA owns and operates both the Darst-Webbe and Clinton Peabody housing projects. Defendant HUD is the federal agency charged with administration and enforcement of the United States Housing Act, 42 U.S.C. §§ 1437 et seq., including the HOPE VI program; the Housing and Community Development Act of 1974, 42 U.S.C. §§ 5301 et seq.; and the Fair Housing Act, 42 U.S.C. §§ 3601 et seq. Defendant, Mel Martinez,[4] is the Secretary of HUD and, as such, is responsible for the administration and enforcement of all functions, powers, and duties of HUD.
The immediate controversy began in January 1995, when SLHA was granted a HOPE VI grant of $46.7 million to revitalize the severely distressed Darst-Webbe public housing development located on the near south side of the City of St. Louis. At that time, Darst-Webbe was composed of six Darst-Webbe Family buildings, Webbe Elderly and Paul Simon.[5] The latter *942 two were reserved for elderly and disabled households eligible for public housing. On February 2, 1995, HUD and SLHA entered into a HOPE VI Implementation Grant Agreement to implement the revitalization. On April 18, 1995, SLHA filed a Revitalization Plan Statement (RPS) with HUD for the Darst-Webbe complex. The RPS called for retaining the two elderly buildings, demolishing all of the Darst-Webbe Family buildings (approximately 758 units), replacing the Family buildings with 200 newly constructed family public housing units, 300 tax-credit units, and 258 for-sale units, and demolishing the adjacent City Hospital and Malcolm Bliss complex. The 1995 RP did not call for spending any HOPE VI funds on the nearby Clinton Peabody development.[6] HUD approved the RPS on July 13, 1995.
On October 3, 1995, SLHA entered into a Memorandum of Understanding (MOU) with plaintiff DWTAB and two other tenant associations. The MOU provided for a Joint Advisory Development Committee which was to meet bi-weekly, approve a development budget as well as any changes therein, and participate in selecting the various professionals involved in planning and implementing the development program. The MOU also provided that the plan and process of relocating Darst-Webbe tenants during the HOPE VI program was subject to the prior written approval of the tenant associations.
On or about September 1997, without prior approval from HUD, SLHA demolished seven buildings at Clinton Peabody containing approximately 88 dwelling units.[7] SLHA did not replace, and does not plan on replacing those 88 units. On or about June 8, 1998, HUD retroactively approved the demolition of the 88 Clinton Peabody units and did not require SLHA to replace them. The demolition of the 88 units were not pursuant to HOPE VI funds, but appear to be in connection with the final phase of the Clinton Peabody modernization.
On August 4, 1997, HUD declared SLHA in default of the HOPE VI grant agreement because it had not moved forward with redevelopment efforts at the hospital complex. Officials of the City of St. Louis and SLHA went to Washington to meet with HUD on August 13, 1997, at which time the City committed to demolish City Hospital and Malcolm Bliss and redevelop these properties as a part of the overall HOPE VI effort. After October, 1997, SLHA convened no meetings of the Joint Advisory Development Committee. Instead, it assembled a Steering Committee which plaintiffs claim significantly reduced the role of Darst-Webbe Family and Clinton Peabody residents in planning, implementing, and monitoring the HOPE VI program. SLHA revised the development budget and selected development professionals without the approval of or consultation with the Joint Advisory Development Committee.
On July 7, 1998, HUD conditionally lifted the default status and set out precisely what SLHA would have to do for full cure of the default. SLHA had to submit a formal Revitalization Plan (new RP) by October 30, 1998, and HUD required SLHA to obtain firm commitments from the City for the infrastructure, hospital complex demolition, and other public improvements *943 for the Darst-Webbe HOPE VI project. Therefore, on July 29, 1998, the City applied to HUD for $50 million in Section 108 loan guarantee assistance. The City sought $20 million of that assistance for the Darst-Webbe Near Southside HOPE VI project to clear the hospital site and to provide the streets, sidewalks, alleys, lighting and other infrastructure in the near southside redevelopment area. On September 8, 1998, the HUD field office in St. Louis recommended to HUD Headquarters approval of the City's Section 108 loan guarantee assistance application.[8] Then on October 30, 1998, SLHA submitted its new RP.
The HOPE VI plan calls for a mixed income program with rental units and home ownership units. The plan is to be carried out in four phases. Phase I of the development is the King Louis Square Apartments, and is located between Tucker Boulevard and 14th Street, across from the old City Hospital. This phase includes 152 rental units broken down into the following categories: 36 are public housing units; 29 are tax-credit units; and, 87 are market rate rentals.[9] At the time of this opinion, Phase I is, for all practical purposes, completed.
Phase II will be a development for the elderly[10] and near elderly[11] and consist of 102 rental units. It will be located at the corner of Chouteau Avenue and Fourteenth Street. Phase III will be located immediately south of Phase II, where the Paul Simon Elderly facility is presently located.[12] It was the Court's understanding that Phase III would consist of 32 units for physically disabled people who are not elderly. But see Paraquad, Inc. v. St. Louis Housing Authority, 259 F.3d 956 (8th Cir.2001) (plaintiffs assert that SLHA refused to provide HOPE VI replacement housing and supportive services to disabled families)[13]. The elderly and the disabled *944 housing tenants used to be housed in the same facilities, but representatives of Paul Simon and other elderly groups indicated that they would prefer to be segregated into two separate developments. Most of the units in Phase II and III are one bedroom units, with a few two bedroom units.
Phase IV includes the remainder of the units to be developed under the HOPE VI project.[14] These include 148 family rental units, of which 44 will be family public housing; 15 tax-credit units; 89 market rate units; and 250 home ownership units. The most significant change between the new and old RPs, is the addition of the Clinton Peabody development. This revitalization will occur in the fourth phase. The plan calls for some further demolition of units at Clinton Peabody, but the number of units and location of the units is still unclear.
Approximately 220 families were displaced from Darst-Webbe Family by the HOPE VI activities. Ninety-six of those families relocated to the Clinton-Peabody housing development, while most of the other families went to other public housing developments in St. Louis. All of the families did relocate somewhere, and there was no evidence that any of the former Darst-Webbe tenants were presently without a home.

CONCLUSIONS OF LAW
The Third Amended Complaint was setup in such a fashion that it is difficult for the Court to decipher exactly what the plaintiffs are alleging, what they would like the Court to find, and what they would like the Court to do in regards to its findings. For instance, the Complaint begins with a Preliminary Statement which is marked as paragraph 1., but which continues for over a page and is actually presented in four paragraphs. Then the Complaint has a section for Parties, which is then divided into a section for plaintiffs and defendants. The section for plaintiffs contains paragraphs 4-12, and goes on for more than 3 pages. Then there are over 5 pages of Statutory and Regulatory Framework, which simply lists federal statutes and regulations and traces the recent history of these laws. Following the Statutory and Regulatory Framework, is the Statement of Facts. Then, finally, comes the Claims for Relief, which lists the 19 Counts. However, there is only a single paragraph for each Count, and no specific relief is requested under this section. Last, but certainly not least, is the section entitled Relief which consists of their prayer and what plaintiffs would really like the Court to do.
The Court has determined that it would be impossible to go through and address each count. Most of the counts overlap in either the facts that might support them, or the relief being sought for them, or both. It is obvious from the disjointed Complaint, summary judgment motions and the arguments made at trial, that nobody knows exactly how to address this cause of action. The issues addressed by the parties often times never meet, and it is impossible for the Court to evaluate the arguments.
Therefore, the Court has decided that the simplest approach is to first examine what relief the plaintiffs are actually seeking, and then determine whether plaintiffs are entitled to the requested relief.

I. Requested Relief
Plaintiffs, during their closing argument to the Court, produced a list outlining their *945 request for relief. The Court has compared this list, with that pleaded in the Third Amended Complaint and found that the relief differed in many respects. The Court can only consider the prayer in the Complaint, and therefore, any additional requests for relief made during argument will not be addressed.
The Third Amended Complaint requested that the Court enter a declaratory judgment that the actions and omissions of SLHA defendants violated the Fair Housing Act, Title VI, the Uniform Relocation Act, the National Housing Act, and the contract between DWTA and the Housing Authority, and the ACC between the Housing Authority and HUD. It also requests that the Court enter a declaratory judgment that the actions and omissions of the federal defendants violated the Fair Housing Act, the Administrative Procedure Act, and the ACC between SLHA and HUD.
Specifically, the Third Amended Complaint requests the Court to enter an injunction as to the following:
1. enjoining the defendants from implementing the new plan, including dismantling and relocating, rather than revitalizing, the Darst-Webbe Family development; demolishing another 217 dwelling units at the Clinton Peabody public housing development; denying plaintiffs the opportunity to occupy new HOPE VI replacement units in their community; and spending $5.3 million of the HOPE VI grant on reconfiguring the Clinton Peabody public housing development;
2. enjoining SLHA defendants to involve plaintiffs fully and meaningfully in planning, implementing, and monitoring the HOPE VI plan;
3. enjoining the defendants to replace one-for-one the 93 Clinton Peabody public housing units demolished without HUD approval;
4. enjoining the federal defendants to withhold or withdraw from the City of St. Louis any commitment of Section 108 loan guarantee assistance until such time as the City has an antidisplacement and relocation plan that provides for all occupied and vacant occupiable low-income dwelling units demolished in connection with a CDBG-assisted activity to be replaced in the same community with comparable replacement dwellings for the same number of occupants and until the HOPE VI plan is revised to provide for replacing in the same neighborhood and in the required numbers and sizes all of the occupied and vacant occupiable low-income dwelling units slated for demolition.
5. enjoining the federal defendants to take all necessary steps to further fair housing affirmatively in the HOPE VI program.
Some of the above requested reliefs are automatically unavailable to plaintiffs even if their claims against defendants are valid. For instance, plaintiffs request that the Court enjoin the defendants from implementing the new plan, including dismantling and relocating, rather than revitalizing, the Darst-Webbe Family development. This issue is now moot. The Darst-Webbe high rises have all been demolished, all of the old Darst-Webbe tenants have been relocated with most of them going next door to the Clinton Peabody public housing development, and new rental units have been built in the location of some of the old Darst-Webbe buildings. Therefore, it is not possible for the Court to grant this particular relief.
Also, the Court previously held that one for one replacement of the demolished Clinton Peabody units is not a remedy available to plaintiffs in this cause of action. See Memorandum and Order, Case No. 4:99CV354-SNL, doc.# 49 (November *946 30, 1999) (addressing motion to dismiss). Therefore, the Court has already decided that it cannot grant the relief requested in # 3 from the above list.
In that same November 30, 1999 order, the Court went on to explain that plaintiffs drafted their complaint in such a manner that the relief they sought was not tied specifically to each harm they alleged, and therefore, its decision to strike the plea for one for one replacement, would not effect any of the actual claims. However, the Court does believe that the relief requested in # 4 above is tied specifically to Count XIV which the Court previously dismissed under HUD's summary judgment motion. The Court's review of the other 18 counts, finds no connection to the relief requested in # 4. Because the Court finds that the relief requested in # 4 only applies to Count XIV, the Court is unable to grant that relief.

II. Plaintiffs Entitlement to Relief
The Court will first address plaintiffs request to enjoin defendants from denying plaintiffs the opportunity to occupy new HOPE VI replacement units in their community.[15] (emphasis added). It is a little confusing as to what the plaintiffs mean by this request. They might mean that they want priority over individuals living in other public housing developments, or they might mean that they want to be given an opportunity to live in the rental units not designated for public housing. The Court will address both.
First, the Court does not believe that defendants are denying the plaintiffs an opportunity to occupy the units. If plaintiffs qualify, they can apply just like all other individuals. The Court finds no authority to support the proposition that plaintiffs have a right to demand priority over individuals living in other public housing developments who might want to live in the new units.
Second, if plaintiffs are arguing that they are denied the opportunity to occupy the units because they cannot qualify, the Court has no authority to force defendants to give them an opportunity. First, the Court strongly questions whether plaintiffs have a right to live in those units presently built for non-public housing such as the market rate rental units, if they cannot afford them. Second, and more importantly, the Court does not have the authority to step in and demand that defendants give plaintiffs units that were meant to be market rate rental. Those were built with federal funds, with the assumption that they would get some return through monthly rent payments.
In addition, the Court cannot step in and make the determination that the units to be built for the elderly and disabled in Phases II and III should be open to large families. The Elderly and Disabled individuals were not represented in the present cause of action and they appear to be working with the housing authorities and are content with the progress on their developments.[16] For the Court to come in and order that those units be made into family housing units would essentially be discriminating against the Elderly and Disabled. The Court cannot find any authority which gives plaintiffs priority over the elderly and disabled who also need public housing.
The remaining requests for relief address the Clinton Peabody public housing development. Plaintiffs request that the Court enjoin defendants from demolishing another 217 dwelling units at Clinton Peabody *947 and from spending $5.3 million of the HOPE VI grant on reconfiguring the Clinton Peabody public housing development. The first question to be addressed is whether the claims involving the Clinton Peabody development are ripe. HUD claims that it has not made a decision to allow $5.3 million of HOPE VI grant funds to be spent on reconfiguring Clinton Peabody, and it has never issued a final agency decision on the matter. Therefore, it argues, there is no final decision for the Court to review.
The Court agrees that HUD has not approved an actual detailed development plan for Clinton Peabody; however, as HUD admits, it did approve in concept the reconfiguration of Clinton Peabody. The April 28, 1999, letter from HUD to SLHA approved SLHA's new RP, and gave SLHA permission to commence Phase I. In that letter, HUD states that [t]his letter expands the scope of the HOPE VI grant, and amends the Grant Agreement to include CPF [Clinton-Peabody] within the scope of the Plan. Although, HUD has not approved the number of units which will be demolished, or the particular buildings that will be demolished, it is clear from the April 28, 1999 letter, that under the plan there will be further demolition at Clinton-Peabody. The letter states that SLHA proposes to demolish selected buildings to reduce density ... We concur that the size, site layout and density of the housing at CPF ... must be addressed. The letter goes on to state that [t]wo significantly different approaches to the density reduction are being considered ... Both include demolition of buildings. Finally, HUD states in the letter that the ultimate plan for revitalization of CPF must reduce the concentration of PH [public housing] units at CPF ... and integrate the public housing and non-public housing units, to the maximum extent feasible.
The HOPE VI plan has continuously changed since the funds were awarded to SLHA, and HUD always has to approve the final developer's plan for each phase. However, that does not mean that plaintiffs claims are not ripe. Although it is unclear whether the housing authorities plan on demolishing 217 units, or that they will spend $5.3 million on the project, it is clear that reconfiguration will take place at Clinton Peabody under the HOPE VI project. The Eighth Circuit even assumed this fact in Paraquad, 259 F.3d at 958 ( [t]he plan's major components include ... selective demolition and reconfiguration of the Clinton Peabody site). It is obvious that HUD has approved the addition of the Clinton Peabody development to the scope of the HOPE VI plan. It is also obvious that HUD has approved the idea of reducing the concentration of public housing at Clinton Peabody, and the only way to reduce the concentration is to demolish units. Therefore, the Court finds that plaintiffs claims regarding HOPE VI funds for the reconfiguration of Clinton Peabody are ripe, and there has been a final agency decision for the Court to review. HUD did issue a final decision that the scope of the HOPE VI grant is expanded to include the Clinton Peabody development, and the Court does have the authority to review that decision.
Judicial review of HUD's decision is pursuant to the Administrative Procedure Act (APA). Under the ADA, the Court must hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, or without observance of procedure required by law. 5 U.S.C. § 706(2)(A), (D). HOPE VI grants may only be used to carry out revitalization programs for severely distressed public housing. 42 U.S.C. § 1437v(d)(1). All *948 parties seem to agree that a public housing development must be severely distressed before it qualifies for HOPE VI funds. In fact, in a letter sent November 21, 1998, by HUD to SLHA, HUD concludes that there is no legal prohibition to adding Clinton Peabody to the HOPE VI plan so long as the Clinton Peabody project itself qualifies as a severely distressed or obsolete public housing project so that the use of HOPE VI funds for that project constitutes an eligible use of grant funds.
Despite knowing this requirement, there is no documentation that HUD actually found that the Clinton Peabody public housing development qualified as severely distressed public housing. Severely distressed public housing is defined as a public housing project that:
(i) requires major redesign, reconstruction or redevelopment, or partial or total demolition, to correct serious deficiencies in the original design (including inappropriately high population density), deferred maintenance, physical deterioration or obsolescence of major systems and other deficiencies in the physical plant of the project;
(ii) is a significant contributing factor to the physical decline of and disinvestment by public and private entities in the surrounding neighborhood;
(iii) (I) is occupied predominantly by families who are very low-income families with children, are unemployed, and dependent on various forms of public assistance; or
(II) has high rates of vandalism and criminal activity (including drug-related criminal activity) in comparison to other housing in the area;
(iv) cannot be revitalized through assistance under other programs ...
42 U.S.C. § 1437v(j)(2)(A).
HUD's approval of the new HOPE VI plan, in which it also approved the addition of the Clinton Peabody development, simply stated that Clinton Peabody had undergone four separate phases of modernization but the scope of that modernization will not, however, address the development's roof problems, nor its density and poor design, which contribute to a serious crime problem. HUD concluded that the size, site layout and density of the housing at CPF contributes to crime and management problems and must be addressed to assure the viability of revitalization efforts at DW and the Near Southside neighborhood. HUD never stated that Clinton Peabody qualified as severely distressed public housing, nor are the above statements detailed enough for the Court to assume that HUD found Clinton Peabody to be severely distressed. The definition of severely distressed public housing, requires more than a finding that crime exists at the site. The statutory definition requires high rates of vandalism and criminal activity ... in comparison to other housing in the area. There is no information in HUD's approval that these conditions exist.
In other words, HUD needed to determine that Clinton Peabody qualified as severely distressed public housing, and it needed to specify what factors it looked at and why it came to that determination. HUD did neither of these before approving the expansion of HOPE VI to include the Clinton Peabody development. HUD states in one of its briefs that the administrative record reflects ample evidence of serious design deficiencies, however, it is impossible for the Court to determine what evidence HUD relied on in the administrative record. There is also evidence in the administrative record that Clinton Peabody was structurally sound and will be viable as public housing for the next twenty years. In addition, $30 million was just spent on the modernization of the development. HUD might have determined that Clinton Peabody qualified, and *949 that determination might be well-founded, but there is no documentation of it.
In reviewing whether an agency decision was arbitrary, capricious, abuse of discretion, or otherwise not in accordance with law, a court must look at whether the agency considered those factors Congress intended it to consider; whether the agency considered factors Congress did not intend it to consider; or whether the agency failed entirely to consider an important aspect of the problem. Downer v. United States Dep't of Agric., and Soil Conservation Serv., 97 F.3d 999, 1002 (8th Cir.1996). The Court has no idea what factors HUD considered other than the factor that crime exists at Clinton Peabody, and that it contributes this to poor design of the development. In addition, an agency acts arbitrarily and capriciously if it fails to articulate a satisfactory explanation for its action, including a rational connection between the facts found and the choice made. Menorah Medical Center v. Heckler, 768 F.2d 292, 295 (8th Cir. 1985). HUD never even articulated a finding that Clinton Peabody qualifies as severely distressed public housing, much less articulate an explanation of why it concluded that.
The Court finds that HUD's action of expanding the scope of the HOPE VI project to include the Clinton Peabody development was without observance of procedure, and not in accordance with statutory law, in that it failed to find that Clinton Peabody qualified as severely distressed public housing. Therefore, the Court is setting aside HUD's approval of including Clinton Peabody in the HOPE VI project. The Court's decision does not prevent a future finding by HUD that the Clinton Peabody development qualifies as severely distressed public housing, but it does encourage HUD to consider all the factors listed in 42 U.S.C. § 1437v(j)(2)(A), and not to consider any additional factors not listed. The Court's decision only sets aside HUD's decision to extend the scope of the HOPE VI plan to include the Clinton Peabody development, and does not effect any other part of HUD's HOPE VI approval.
Finally, plaintiffs requested that the Court enjoin the federal defendants to take all necessary steps to further fair housing affirmatively in the HOPE VI program. Obviously, HUD believes that it has taken all necessary steps to further fair housing. If plaintiffs are requesting that the Court set out detailed steps, it will not do so. First, although the Court can review agency decisions, it has little authority to direct an agency on exactly what to do, exactly how to do it, and exactly how to fund it. Similarly, the Court is not going to give specific instructions to the defendants, telling them how they should involve plaintiffs in the planning, implementing, and monitoring of the HOPE VI plan. Defendants should involve plaintiffs in the planning, and the Court believes defendants know that. It appears from the evidence that participation started strong, but then began to deteriorate. And of course, the filing of a lawsuit does not always lend itself to open and amicable communication. It makes it increasingly more difficult for the parties to talk and make any kind of progress with the project.
This is a case that never should have been before the Courts. Plaintiffs are public housing tenants and defendants are the agencies responsible for providing public housing. They both depend on each other, and it is logical that they should work together, even without a legal mandate to do so. The Court seriously hopes all parties involved can resolve their problems, and work together to achieve the best results in completing this worthwhile project.

*950 CONCLUSIONS

The nature of this cause of action requires a somewhat unconventional approach. The Court found that the logical place to start was to consider the remedies requested, and then decide if plaintiffs were entitled to those remedies. The Court does find that HUD's action of expanding the scope of the HOPE VI project to include the Clinton Peabody development was without observance of procedure, and not in accordance with statutory law, in that it failed to find that Clinton Peabody qualified as severely distressed public housing. Therefore, defendants are enjoined from spending any of the HOPE VI grant on the Clinton Peabody development until such time that it might determine that the Clinton Peabody development qualifies as severely distressed public housing as that is defined in 42 U.S.C. § 1437v(j)(2)(A).
The Court finds that it has addressed the remainder of plaintiffs claims[17] and finds in favor of plaintiff on counts VII and XIX. On all other remaining counts, the Court finds in favor of the defendants. The Court considers this a final disposition of all claims in this cause of action.
NOTES
[1] It is somewhat difficult to decipher the exact allegations from the generalized pleadings, but the Court believes that the counts in the Third Amended Complaint allege the following:

Count I alleges that SLHA has made unavailable and denied housing to plaintiffs, and discriminated against plaintiffs because of race in violation of the Fair Housing Act, by developing and promulgating a new HOPE VI plan which results in the loss of 895 housing units for persons with very low income.
Count II alleges that SLHA has made unavailable and denied housing to plaintiffs, and discriminated against plaintiffs because of sex in violation of the Fair Housing Act.
Count III alleges that SLHA has made unavailable and denied housing to plaintiffs, and discriminated against plaintiffs because of familial status in violation of the Fair Housing Act.
Count IV alleges that SLHA excluded plaintiffs from participation in, denied them the benefits of, and subjected them to discrimination on the grounds of race under a program and activity receiving federal financial assistance in violation of Title VI, 42 U.S.C. § 2000d and 42 U.S.C. § 1983.
Count V alleges that by taking steps to demolish and demolishing a portion of the Clinton Peabody public housing development without having obtained HUD approval and without otherwise complying with statutory and regulator requirements, SLHA violated plaintiffs rights under 42 U.S.C. § 1737p and § 1983.
Count VI alleges that SLHA is dismantling and relocating, rather than revitalizing the Darst-Webbe Family development in violation of HOPE VI, 42 U.S.C. § 14371, note, 42 U.S.C. § 1437v, and § 1983 by developing a new HOPE VI plan in which approximately 895 units of very low-income family public housing will be permanently lost and 63 percent of the displaced Darst-Webbe Family households will be ineligible for the newly constructed replacement housing.
Count VII alleges that SLHA is spending grant funds on a public housing development other than the severely distressed Darst-Webbe public housing development for which they were awarded and in lieu of modernization funds in violation of HOPE VI.
Count VIII alleges that the SLHA has failed to develop a HOPE VI plan consistent with the City's Consolidated Plan in violation of 42 U.S.C. § 14371, note and § 1983.
Count IX alleges that SLHA has failed to brief and involve the Darst-Webbe and Clinton Peabody Tenant Associations meaningfully in developing, implementing, and monitoring the HOPE VI program and has failed to give full consideration to their concerns in violation of the same statutes as Count VIII.
Count X alleges that SLHA has failed to provide relocation advisory services in violation of the Uniform Relocation Act, 42 U.S.C. § 4625(c), 49 C.F.R. §§ 24.204, 24.205, and § 1983 by failing to adequately assess the needs and preferences of the displaced households, failing to give them reasonable opportunities to relocate to decent, safe, and sanitary dwellings not located in areas of African-American concentration, and failing to provide the displaced families with comparable replacement housing.
Count XI alleges that SLHA materially breached the Memorandum of Understanding (MOU) between the Darst-Webbe Association and SLHA by failing to meet bi-weekly with the Joint Advisory Development Committee, by relocating Darst-Webbe Family residents without a relocation plan approved in writing by the tenant associations of the Darst-Webbe development, and by selecting consultants for the development project without either the advice and consent of the Joint Advisory Development Committee.
Count XII alleges that SLHA materially breached the Annual Contributions Contract (ACC) and violated plaintiffs rights as intended beneficiaries under that contract, by demolishing a portion of the Clinton Peabody public housing development without having obtained HUD approval and without complying with statutory and regulatory requirements.
Count XIII alleges that HUD failed to further fair housing affirmatively in violation of 42 U.S.C. § 3608(e) by approving a Section 108 loan guarantee to assist the Darst-Webbe HOPE VI plan which discriminates against African-Americans, women and children and consigns the displaced Darst-Webbe Family households to live in racially segregated public housing developments.
Count XV alleges that HUD abused its discretion and acted arbitrarily, capriciously, not in accordance with law, in excess of statutory authority and without observance of the procedure required by law in violation of the Administrative Procedure Act (APA), by approving the demolition of a portion of the Clinton Peabody public housing development without requiring SLHA to replace the demolished dwelling units and otherwise comply with statutory and regulatory requirements.
Count XVI alleges that HUD materially breached the ACC and violated plaintiffs rights as intended beneficiaries of the ACC by failing and refusing to enforce those terms and conditions of the ACC which prohibit SLHA from demolishing public housing developments or portions thereof without HUD approval and without compliance with statutory and regulatory requirements.
Count XVII alleges that HUD violated the APA by approving a Section 108 loan guarantee to assist the Darst-Webbe HOPE VI plan which discriminates against African-Americans, women and children and consigns the displaced Darst-Webbe Family households to live in racially segregated public housing developments.
Count XVIII alleges that HUD committed the same violation as in Count XVII by approving the new Darst-Webbe HOPE VI plan which discriminates in the same manner as described in Count XVII.
Count XIX alleges that HUD violated the APA by approving the new Darst-Webbe HOPE VI plan in which $5.3 million of the HOPE VI grant will be spent on reconfiguring the Clinton Peabody public housing development.
[2] The Court actually received the substantive motions on May 20, 2001. The Notices for the motions were filed on March 30, 2001, and pursuant to local rules, the briefs were backdated to the time of Notice.
[3] The parties sometimes refer to the 20 binders of exhibits as the administrative record. However, this is not an administrative record in the true sense of the term and includes documents from various sources. Although HUD provided the administrative record all three parties rely on it in their briefs and throughout the trial. In addition, these exhibits were not really filed with one document being one exhibit. Rather, each page of the administrative record was given its own referral number. The exhibits were originally filed as loose papers in boxes, but the Court ordered the parties to put the loose leaf paper in binders so that it might be filed in the Court's file room. This resulted in actual documents being separated. For instance, the basic HOPE VI plan began in binder # 8 in box # 4, but abruptly stopped mid-sentence without a notation that the document continued in another binder. The remainder of the plan was found in binder # 9 in box # 5. As is obvious from this illustration, it was very difficult for the Court to review the evidence in this cause of action. Nonetheless, the Court tried to muddle through it, and hopefully found all of the pertinent documents.
[4] Mel Martinez has been substituted as defendant in this cause of action for Andrew Cuomo, former Secretary of HUD.
[5] DWTAB only represents former residents of Darst-Webbe Family. Residents of Webbe Elderly and Paul Simon are not represented in this cause of action.
[6] The Clinton Peabody housing development was undergoing comprehensive modernization at the time the HOPE VI funds were granted. The modernization began in the early 1990s and was implemented in four separate phases, of which the last phase was just completed in 1998. The cost for the modernization project was nearly $30 million.
[7] Public housing agencies are required to get HUD's approval prior to demolishing any public housing units.
[8] However, as of March 20, 2000, the City still had not identified sufficient collateral for the $20 million in Section 108 loan guarantee assistance for the Darst-Webbe project, and SLHA was informed that HUD could not allow expenditure of HOPE VI funds unless funding for the infrastructure improvements for the project was in place by May 1, 2000. On April 3, 2000, the City provided liens on $23 million worth of downtown real estate owned by the City and assignment of three promissory notes as security for the $20 million in Section 108 loan guarantee assistance for the Darst-Webbe project. On April 25, 2000, the St. Louis HUD Field Office again recommended approval of the Section 108 funds, and on June 16, 2000, the HUD Headquarters Office recommended approval. HUD Assistant Secretary Ruster made the offer of commitment to the City for those funds on June 19, 2000.
[9] These numbers vary slightly between witnesses. One witness testified that there was a total of 156 units, 91 of which were market-income rental. The Court finds that this variance is insignificant.
[10] Residents must be 62 years old or older to qualify.
[11] This includes people who are 50 to 61 years old.
[12] Paul Simon Elderly is to be demolished in the near future, and Webbe Elderly has already been demolished.
[13] In Paraquad, Inc., plaintiffs claimed that the HOPE VI plan should set aside housing units specifically reserved for non-elderly disabled people, but that the plan was not doing so. The only units being set aside were for the elderly. This Court believed from the evidence presented in this case that Phase III was to accomplish this by reserving these units specifically for non-elderly disabled housing tenants. However, the trial for this case occurred in late July 2001, and the Eighth Circuit ruled in Paraquad, Inc. on August 8, 2001. Therefore, the Court is unclear whether it misunderstood the evidence for Phase III, or if the HOPE VI plan has recently changed and the plaintiffs in Paraquad were not immediately told, nor the Eighth Circuit informed that the disabled tenants would have their own facility.
[14] This is in the very early stages of planning, and the Court is unclear where the units built in Phase IV will be located.
[15] It is unclear from the prayer, whether plaintiffs refers to only those which have been relocated, or if that means all plaintiffs.
[16] But see Paraquad, Inc., 259 F.3d 956, and supra note 13.
[17] Counts I-IV, XIII, XVII, and XVIII contain allegations of discrimination based on race, sex, and familial status. Although the Court did not analyze these counts, it would like to note that it found absolutely no evidence of discrimination. Furthermore, plaintiffs sought no relief that would address the alleged acts of discrimination, and even plaintiffs chose not to include these counts in their summary judgment motion.