**Mary REESE, et al., Plaintiffs,**

**v.**

**MIAMI–DADE COUNTY, et al., Defendants.**

**No. 01–3766–CIV.**

United States District Court, S.D. Florida.

Dec. 5, 2002.

Charles F. Elsesser, Jr., Florida Legal Services Inc., Miami, FL, Benjamine Reid, Miami, FL, Todd Isaac Espinosa, Nationalo Housing Law Project, Oakland, CA, for Plaintiffs.

John Darrell McInnis, Terrence Andrew Smith, David Stephen Hope, Cynji Lee, Dade County Attorney's Office, Miami, FL, Laura W. Bonn, Miami, FL, for Defendants.

### ORDER

HIGHSMITH, District Judge.

THIS CAUSE is before the Court upon Plaintiffs' Motion for a Preliminary Injunction Against Miami–Dade County and Rene Rodriguez (**DE 13**). This Court referred the motion to United States Magistrate Judge William C. Turnoff for issuance of a Report & Recommendation ("R & R"). Before the Court is Magistrate Judge Turnoff's R & R, issued on September 11, 2002. Also before the Court are Plaintiffs' Objections to the R & R and the County Defendants' Response to Plaintiffs' objections. The R & R advises this Court to deny the motion on the grounds that Plaintiffs (1) are not likely to succeed on the merits and (2) did not make a sufficient showing of irreparable harm.

After a careful *de novo* review of the R & R, Plaintiffs' objections, Defendants' response, the case file, and the pertinent authorities, the Court concurs with Magistrate Judge Turnoff's findings and analysis and hereby ADOPTS the R & R in its entirety.[1]

Accordingly, it is ORDERED AND ADJUDGED that Plaintiffs' motion for a preliminary injunction against Miami–Dade County and Rene Rodriguez is DENIED.

### REPORT AND RECOMMENDATION

TURNOFF, United States Magistrate Judge.

This Cause comes before the undersigned for a Report and Recommendation on Plaintiffs' Motion for a Preliminary Injunction Against Miami–Dade County and Rene Rodriguez (D.E.13). A hearing on the matter was held on May 22, 2002. Through the Motion for Preliminary Injunction, Plaintiffs seek to enjoin Defendants from relocating the residents of the James E. Scott Homes Public Housing Project or further demolishing the James E. Scott Homes. For the reasons stated below, this Court should deny Plaintiffs' Motion in its entirety.

### I. FINDINGS OF FACT

#### A. THE PARTIES

1. Plaintiff, Mary Reese ("Reese"), is a public housing resident presently residing in James E. Scott Homes ("Scott Homes"), a public housing development, with her two (2) children ages fifteen (15) and twenty-five (25). (D.E. 1; D.E. 53, Ex. B at 7).

2. Plaintiff, Velma Bailey ("Bailey"), a former public housing resident, resided in

---

1. Paragraph 36 of Magistrate Judge Turnoff's R & R is hereby modified to replace the word "residents" with the word "households."

Scott Homes with her ten (10) minor children. Bailey and her family have relocated to the residential community of Country Walk with the use of one of the County's Section 8 vouchers. (D.E. 1; Tr. at 91–93).

3. Defendant, Miami–Dade County (the "County") is a political subdivision of the State of Florida. The County is the designated public housing authority in this jurisdiction. The County's Miami–Dade Housing Agency ("MDHA") presently administers public housing and other federally subsidized housing programs in the County. (D.E.1).

4. Defendant, Rene Rodriguez ("Rodriguez"), in his official capacity, is presently and at all times material hereto has been the Director of MDHA. (D.E.1).

## B. FACTUAL BACKGROUND

5. In 1992, the Congressional Commission on Severely Distressed Public Housing was established to identify severely distressed or obsolete public housing developments and offer solutions for their revitalization. The result of the Commission's inquiry was the Homeownership and Opportunities for People Everywhere ("HOPE VI") program, which targets, for purposes of revitalization, distressed public housing developments that: (1) are uninhabitable because of poor siting or design; (ii) have heavy concentrations of poverty; (iii) have high rates of vandalism or criminal activity; or (iv) contribute significantly to disinvestment in the surrounding communities. (D.E. 53, Ex. A, Ozdinec Decl. ¶ 4).

6. Scott Homes and Carver Homes (collectively "Scott–Carver Homes") are two public housing developments, located within the County's jurisdiction and operated by MDHA. Scott Homes and Carver Homes were built in 1954 and 1964, respectively. Currently, the total number of units between Scott Homes and Carver Homes is 850. (D.E. 127; Pls.' Ex. 8).[1]

7. Ninety-nine (99%) percent of the Scott–Carver Homes' residents are African–American. Many of these residents include families with children under the age of eighteen (18). (D.E.1).

8. Scott–Carver Homes currently meets the definition of "severely distressed" for purposes of the HOPE VI program. According to the County's 1999 HOPE VI grant application to the United States Department of Housing and Urban Development ("HUD"), both developments are antiquated, the units too small, and the density too high. Additionally, there are serious structural, site and infrastructure defects, which render Scott–Carver Homes overdue for demolition and redevelopment through the HOPE VI program. (D.E. 127; Pls.' Ex. 5).

9. The County lacked the necessary financial resources to rehabilitate Scott–Carver Homes because of past expenditures used to rehabilitate other public housing developments destroyed during Hurricane Andrew in 1992. (D.E. 118 at 11).

10. The County initially determined that Scott Homes would be a good candidate for a HOPE VI Revitalization Grant because it was severely distressed. (D.E. 116 at 14–16).

11. In 1996, HUD published a Notice of Funding Availability ("NOFA") seeking

---

1. "Pls.' ex. # or "Defs.' ex. # " refer to either Plaintiffs or Defendants' exhibits which are listed in the Joint Stipulation Concerning Evidence for Hearing on Motion for Preliminary Injunction (D.E.127).

HOPE VI grant applications from public housing authorities around the country.

12. In response to the NOFA, the County Defendants submitted a grant application for Scott Homes in which it sought to demolish approximately 149 of the existing public housing units and revitalize the remaining 605 units, which would remain as public housing units. (Pls.' Ex. 8). However, HUD did not fund the grant application. (D.E. 1; D.E. 116 at 9).

13. In 1997, the County once again submitted an application in response to HUD's NOFA for HOPE VI funding. The 1997 application proposed to demolish 340 of the existing 754 units located within Scott Homes, to build 140 new replacement units, and to revitalize the remaining units. The County's Revitalization Plan proposed to leave 554 on-site units. Of the number of on-site units, the County proposed to keep 292 public housing units and 262 affordable rental units to be built by private developers. Again, HUD did not fund this application. (D.E. 1; D.E. 116 at 10).

14. In 1998, the County submitted another HOPE VI application. This proposal was the first time the County included Carver Homes as part of its revitalization efforts. According to the application, the County proposed to demolish all of the existing public housing units located within Scott–Carver Homes, and replace them with 401 units comprised of 246 public housing units, 72 rent-to-own units, 63 low-income tax credit units and 20 market rate units. Again HUD did not fund this application. (Pls.' Ex. 7; D.E. 1; D.E. 116 at 10–12).

15. On February 26, 1999, HUD issued a Super Notice of Funding Availability ("Super NOFA") announcing the availability of approximately $523 million in HOPE VI revitalization funds. The Super NOFA included a number of qualifications, which each applicant would have to satisfy in order to be awarded revitalization funds. (Defs.' Exs. 3 and 4).

16. The Super NOFA required that each applicant's proposal must be designed to lessen the concentration of low-income households, create opportunities for desegregation, and offer viable housing choices in the design of the new development. (D.E. 53, Exhibit A, Ozdinec Decl. ¶ 5; Defs.' Exs. 3 and 4).

17. The Super NOFA required that each proposal affirmatively further fair housing and encourage diversity via the following: (1) physical design of the revitalized units; (2) location of the new units; and (3) marketing of housing types. The Super NOFA also stated that diversity can be accomplished if the applicants' marketing and outreach activities "target all segments of the population on a nondiscriminatory basis, promote housing choice, and opportunity throughout [the applicant's] jurisdiction, and contribute to the deconcentration of minority and low-income neighborhoods." (Defs.' Exs. 3 and 4).

18. The Super NOFA required all applicants to certify that they had matching funds, which could be combined with the HUD funds to carry out the revitalization activities. (Defs.' Exs. 3 and 4).

19. The Super NOFA required all applicants to comply with the requirements set forth in the Uniform Relocation and Real Property Acquisition Act. (Defs.' Exs. 3 and 4).

20. The Super NOFA did not require successful applicants to comply with the Housing and Community Development Act. (Defs.' Exs. 3 and 4).

21. The Super NOFA did not require that applicants' revitalization plans provide a one-for-one replacement of each public housing unit demolished. (Defs.' Exs. 3 and 4).

22. The County submitted to HUD its fourth HOPE VI application for Scott–Carver Homes in response to the 1999 Super NOFA. (Pls.' Ex. 8).

23. The County's application required all of the present public housing units be demolished and subsequently replaced with 371 on-site units, plus an additional 91 affordable homeownership off-site units. With regard to the on-site units, the County proposed to build 80 public housing units, 135 public housing rent-to-own units and 156 affordable homeownership units. (Pls.' Ex. 8).

24. The County's HOPE VI Revitalization Plan ("Revitalization Plan") proposed to lessen concentration of low-income families and offer desegregation opportunities via the following: reduction of on-site density by 56%, construction of new homes, and rent-to-own and traditional public housing units. (Pls.' Ex. 8, Revitalization Plan, Ex. E at 3 and Attach. 6).

25. The Revitalization Plan also stated, "WE CAN'T CONTROL: HOPE VI requisites mandated by HUD: Lessen the concentration of poverty; discourage concentrations of minorities in undesirable neighborhoods." (Pls.' Ex. 8, Revitalization Plan, Attach. 6).

26. The Revitalization Plan also stated "WE CAN'T CONTROL: Adker Decree, which refers to this Court's Consent Decree entered on October 28, 1998 in the matter of *Adker v. United States Dept. of Housing and Urban Dev.,* Case No. 87–0874 CIV–PAINE (October 28, 1998)." Pursuant to that Decree, the County is required to desegregate its Section 8 and public housing programs along with other housing opportunities programs which come within the County's control. (Pls.' Ex. 8, Revitalization Plan, Attach. 6; Defs.' Ex. 7 and 8).

27. The Adker Decree governs the County's present HOPE VI plans for Scott–Carver Homes. (Defs.' Ex. 7).

28. The Revitalization Plan neither denoted nor connoted that the reason the County selected Scott–Carver Homes for revitalization, was due to the race of the current residents.

29. The Revitalization Plan stated that Scott–Carver Homes were selected because they are severely distressed. (Pls.' Ex. 8; Revitalization Plan, Ex. A at 1–3).

30. The reference to desegregation or discouraging minorities in neighborhoods relates only to the requirements set forth in the Super NOFA and only as it relates to the newly constructed development. (Defs.' Exs. 3 and 4).

31. In addition to the requested HUD award, the Revitalization Plan also included a commitment of approximately $65 million in additional resources to complete the proposed revitalization activities. Of this funding, the County's Office of Community and Economic Development ("OCED") committed $2 million in Community Development Block Grant ("CDBG") to this project. (Pls.' Ex. 8, Revitalization Plan Attach. 26).

32. The Revitalization Plan included a socioeconomic study, dated May 20, 1999, prepared by Goodkin Consulting. (Pls.' Ex. 8, Revitalization Plan Attach. 15).

33. The Revitalization Plan also proposed to relocate all of the present residents of Scott–Carver Homes to other

replacement housing through MDHA's Section 8 vouchers, public housing, home-ownership and rent-to-own programs. (Pls.' Ex. 8).

34. Scott Homes is divided into four sectors, i.e. I, II, III, and IV, for purposes of relocation, demolition and revitalization. The Carver Homes units are not included in any of the sectors, but these residents will be relocated at the same time as the Scott Homes residents residing in Sector IV. (Pls.' Ex. 8).

35. The relocation of the Scott–Carver Homes residents will be completed over a four-year period. (Pls.' Ex. 8).

36. The total number of residents to be relocated under the Revitalization Plan is 826. (Pls.' Ex. 8).

37. In 1999, HUD approved the County's HOPE VI application due to its Revitalization Plan. As a result, HUD awarded the County $35 million. (D.E.1).

38. HUD, through its Acting Deputy Assistant Secretary for Public Housing Investment, Milan Ozdinec, stated that "MDHA's 1999 application would not have been funded if it included replacing all or most of the 850 public housing units currently located at Scott and Carver," of which 754 units are located within Scott. The Deputy Secretary further stated that the application was approved because "it significantly reduced the number of public housing units that would be put back on site of Scott and Carver." (D.E. 53, Exhibit A, Ozdinec Decl. ¶ 5).

39. Following the award of the County's HOPE VI grant application, sixty-four (64) of the units located in Scott Homes were flooded due to the "No Name Storm" of the Fall of 2000. As a result, the residents in these units were relocated. (D.E. 37, Ex. A, Brewster Decl. ¶ 19).

40. On April 10, 2001, the Miami–Dade Board of County Commissioners ("Commission"), adopted Resolution Number 376–01 authorizing the transfer of $6 million to Miami–Dade Housing Finance Authority to construct one hundred and fifty (150) single-family homes to be purchased by public housing residents. Current residents of Scott–Carver Homes will be given the right of first refusal to purchase these homes. (Defs.' Ex. 1).

41. On April 20, 2001, the County executed a contract with the National Housing Group to serve as a Relocation Service Provider for the Scott–Carver Homes HOPE VI revitalization project. The total price for this contract is $1,998,586. (Defs.' Ex. 9).

42. The Relocation Service Provider's responsibilities include, but are not limited to, providing the required relocation counseling to Scott–Carver Homes residents, providing financial and technical relocation assistance, recruiting prospective landlords to participate in the County's Section 8 program, and creating and maintaining relocation and landlord databases. (D.E. 121 at 37–39; Defs.' Ex. 9).

43. On May 8, 2001, the Commission adopted Resolution Number 495–01 requiring the County to construct an additional one hundred and seventy-five (175) Section 8 project-based affordable housing units to accommodate those Scott–Carver Homes residents displaced as a result of the HOPE VI project. (Defs.' Ex. 2).

44. On August 16, 2001, the County entered into a contract with H.J. Russell & Company to serve as Program Manager for the Scott–Carver Homes HOPE VI revitalization project. The total price of this contract is $2,550,530.00. (Defs.' Ex. 10).

45. On September 6, 2001, Plaintiffs, Reese and Bailey, along with Plaintiffs, Herbert Jones and Patricia Sanders, who were public housing waiting list applicants, and organizational Plaintiff Low Income Families Fighting Together ("L.I.F.F.T.") filed this class action lawsuit against County Defendants, HUD and Mel Martinez, Secretary of HUD ("Federal Defendants"). (D.E.1).[2] Plaintiffs alleged violations of (A) the Fair Housing Act (counts 1–6); (B) Title VI of the civil Rights Act (count 7); (C) Equal Protection (counts 8 and 9); (D) the Quality Housing and Work Responsibility Act of 1998 (count 10); (E) the Housing and Community Development Act (counts 11–13); (F) the Uniform Relocation Assistance and Real Property Acquisition Act of 1970 (count 14); and (G) the National Environmental Policy Act (count 15). In an Order dated July 2, 2002, the Court found that this Court did not have subject matter jurisdiction with respect to count 14 of Plaintiffs' Complaint.

46. On September 6, 2001, the Plaintiffs filed the present Motion for Preliminary Injunction and a Motion for Class Certification. (D.E. 13 and 14). Through this motion for preliminary injunction, Plaintiffs seek to prevent the "forced or voluntary" relocation of the residents of Scott Homes and to prohibit the County from demolishing any of the existing units located within Scott Homes. Plaintiffs move for an injunction on all remaining counts of their Complaint, except under count 15 which pertains to violations of the National Environmental Policy Act. The motion for preliminary injunction also does not seek to enjoin the County from relocating the residents of Carver Homes or from demolishing any of the buildings located within it.[3]

47. On September 19, 2001, the County's Building Department's Unsafe Structures Board ("Board") held a hearing concerning the seventy-eight units flooded during the "No Name Storm." (D.E. 37, Ex. A, Brewster Decl. ¶ 20, Ex. 1).

48. On September 25, 2001, the Board issued an order to MDHA requiring it to demolish the buildings within ninety-days from the date of the order. (D.E. 37, Ex. A, Brewster Decl. ¶ 20, Ex. 1).

49. On October 18, 2001, the Court entered an Order requiring County Defendants to cease and desist from any demolition of any buildings located in Scott Homes until such time as the Court issued an order on Plaintiffs' Motion for Preliminary Injunction. (D.E.24).

50. On April 12, 2002, Plaintiffs filed a Motion for Temporary Restraining Order to enjoin County Defendants from evicted residents remaining in Sector I pursuant to a ninety (90) day notice to vacate. (D.E.91).

51. On April 24, 2002, the Court denied Plaintiffs' Motion for Temporary Restrain-

---

**2.** Plaintiffs moved on December 31, 2001 to drop Jones and further moved to join or intervene Shanlavie Jenkins as a party Plaintiff. (D.E.41). This Court on January 2, 2002 granted said motion. (D.E.42). On May 23, 2002, the Court entered a preliminary Order (D.E.123), after consideration of Federal Defendants Rule 12(h)(3) Suggestion the Court Lacks Jurisdiction Over the Subject Matter (D.E.71) and County Defendants' Motion to Dismiss (D.E.38), in which it granted and denied in part both motions. Pursuant to that Order, the Court determined that Plaintiffs, Jenkins and L.I.F.F.T. lacked standing to bring this action. In a subsequent Order (D.E.125), the Court further ruled that the claims of Plaintiff Sanders were moot.

**3.** In an Order dated July 3, 2002, the Court certified a class composed of all African–American individuals residing in Scott Homes as of September 17, 1999.

ing Order because the parties were able to reach an agreement. (D.E.108).

52. As of May 20, 2002, of the 187 families living in Sector I, 113 were relocated through the use of Section 8 vouchers, sixty-two (62) were relocated to other public housing, two (2) were relocated to homeownership and thirteen (13) were relocated to other housing. As of the date of the hearing on Plaintiffs' Motion for Preliminary Injunction there remained only twenty (22) families located in Sector I. (Defs.Ex. 6).

53. There are twenty-one (21) buildings in Sector I. Six (6) of the buildings are occupied by no more than one family. (Def's Ex. 6).

54. There are families within Scott Homes who wish to relocate through the County's Revitalization Plans, and object to the present lawsuit against the County Defendants. (D.E.119).

55. There are various former residents of Scott Homes who have already relocated with the use of Section 8 vouchers; voluntarily selected the neighborhood in which they presently reside; support the County's Revitalization Plan; and object to the present lawsuit. (D.E.119).

56. At the hearing on the Motion for Preliminary Injunction, Plaintiffs' expert Andrew Beveridge testified extensively on the high minority concentrations of the neighborhoods where the relocated Scott Homes residents with Section 8 vouchers currently reside. Mr. Beveridge, however, conceded that he had no knowledge of the County's relocation plans for Scott Homes nor the choice component included in the relocation process. Mr. Beveridge was unable to determine that there were any residents who relocated to areas where they did not wish to reside. Moreover, Mr. Beveridge also conceded that his analysis did not consider the countywide housing opportunities provided by the County Defendants. He also admitted to having no knowledge regarding the concentrations of African–Americans nor the income mix of the neighborhoods in which they reside in the County. (Tr. 47, 51, 56 and 57).

## II. CONCLUSIONS OF LAW

### A. STANDARD OF REVIEW

To succeed on a motion for a preliminary injunction, Plaintiffs must show: (1) they have a likelihood of success on the merits; (2) there exists, absent the injunction, a significant risk of irreparable harm; (3) the balance of hardships tilts in their favor; and (4) granting the injunction will not adversely affect the public interest. *See Siegel v. Lepore*, 234 F.3d 1163, 1176 (11th Cir.2000); *CBS, Inc. v. Smith*, 681 F.Supp. 794, 802 (S.D.Fla.1988). "A preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly [establishes] the 'burden of persuasion' as to each of the four prerequisites." *Siegel*, 234 F.3d at 1176; *United States v. Jefferson County*, 720 F.2d 1511, 1519 (11th Cir.1983), *quoting Canal Auth. v. Callaway*, 489 F.2d 567 (5th Cir.1983); *see also Shatel Corp. v. Mao Ta Lumber and Yacht Corp.*, 697 F.2d 1352, 1354 (11th Cir.1983). If the movant fails to carry its burden of proving any of the prerequisites, the preliminary injunction should be denied regardless of whether the movant meets the other requirements. *Id.* Here, Plaintiffs have not met their burden to warrant the issuance of a preliminary injunction. The evidence and testimony presented at the hearing on Plaintiffs' Motion for Preliminary Injunction and contained in the record demonstrate Plaintiffs are not entitled to such an

extraordinary form of relief. Plaintiffs' claim for injunctive relief therefore must fail.

## B. PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THE MERITS

### 1. Fair Housing, Civil Rights Act of 1964 and Equal Protection Claims

Plaintiffs assert that County Defendants have violated the Fair Housing Act[4] ("FHA"), the Civil Rights Act of 1964[5] and the Equal Protection Clause through the Fourteenth Amendment. Plaintiffs assert two different types of claims, discriminatory intent claims and disparate impact claims.

Courts across the country have consistently held that there is no constitutional right to housing. *See generally Jaimes v. Toledo Metropolitan Housing Auth.*, 758 F.2d 1086, 1096 (6th Cir.1985) (no constitutional right to be furnished safe sanitary and decent housing by housing authority); *Smith v. Town of Clarkton*, 682 F.2d 1055 (4th Cir.1982) (no constitutional right of individuals to have housing meet a particular standard); *Acevedo v. Nassau County*, 500 F.2d 1078 (2nd Cir.1974) (no constitutional guarantee of access to a dwelling of a particular quality); *Schmidt v. Boston*

*Housing Auth.*, 505 F.Supp. 988 (D.Mass. 1981) (no federal right to low-income public housing). If plaintiffs qualify for housing within the new Scott–Carver Homes, they are entitled to apply like everyone else. *See Darst–Webbe Tenant Ass. v. Saint Louis Housing Auth.*, 202 F.Supp.2d 938 (E.D.Mo.2001) (Plaintiffs' claims to enjoin a public housing authority's HOPE VI plans were rejected). However, "if plaintiffs are arguing that they are denied the opportunity to occupy the [new] units because they cannot qualify, the Court has no authority to force defendants to give them the opportunity." *Id.*

#### a. Discriminatory Intent Claims

Generally, under the FHA it is unnecessary to establish discriminatory intent in order to prove there has been a violation. *Elliott v. City of Athens*, 960 F.2d 975, 984 (11th Cir.1992) (*citing Metropolitan Housing Dev. Corp. v. Village of Arlington Heights*, 558 F.2d 1283 (7th Cir. 1977)). However, if discriminatory intent is claimed, a plaintiff has the burden of showing that the defendants actually intended or were improperly motivated in their decision to discriminate against persons protected by the FHA.

---

**4.** Pursuant to 42 U.S.C. § 3604 it shall be unlawful-

    (a) To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin.

    (b) To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin.

    (c) To make, print, or publish, or cause to be made, printed, or published any notice,

statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on race, color, religion, sex, handicap, familial status, or national origin, or an intention to make any such preference, limitation, or discrimination.

**5.** According to 42 U.S.C. § 2000d, "[n]o person in the United States shall, on grounds of race, color or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

In the instant case, Plaintiffs claim that the County's HOPE VI Revitalization Plan serves as direct evidence of the County's intent to violate not only the FHA, but also the Civil Rights Act of 1964 and the Equal Protection Clause. Specifically, Plaintiffs direct the Court to that part of the County Defendants' application which reads in part, "We cannot control HOPE VI requisites mandated by HUD", which require, in part that, the County "[l]essen the concentration of poverty; [discourage] concentrations of minorities in undesirable neighborhoods." (Pls.' Ex. 8, Revitalization Plan Attach. 6). This language is not discriminatory on its face because it does not "indicate any preference, limitation, or discrimination based on race, color, religion, sex, handicap, familial status, or national origin, or an intention to make any such preference, limitation, or discrimination." 42 U.S.C. § 3604(c). *Cf. Ragin v. The New York Times Co.*, 923 F.2d 995 (2nd Cir.1991) (FHA prohibits use of human models as a medium for expression of a racial preference in a newspaper advertisement thus conveying an illegal message); *United States v. Hunter*, 459 F.2d 205 (4th Cir.1974) (statement that apartments are

in "white home" indicates to the ordinary reader a racial preference in acceptance of tenants).[6] Unlike the facts of the cases relied upon by Plaintiffs to demonstrate racial motivation, the County is not giving any preferential treatment to one group over another nor have any racial classifications been created.[7]

Moreover, present in the 1999 application are references to language similar in nature to the requirements of the Super NOFA but worded differently. In a Fact Sheet, entitled "1999 HOPE 6, What are the characteristics of a winning application", the phrase reads the "lessening of the concentration of low income residents and the creation of desegregation opportunities." *Id; see also* Pls' Ex. 8, Revitalization Plan, Attach. E. The language as it presently appears in the County's HOPE VI application mirrors, albeit not exactly, the language found in the February 26, 1999 HUD Super NOFA, which states "the activities you propose must lessen concentration of low-income households, create opportunities for desegregation, and offer viable housing choices." 64 Fed Reg. 9725, 9735 (1999). The Super NOFA further states that in order to achieve diversi-

---

**6.** HUD's promulgated rules provided some guidance as to the types of advertisement that are prohibited under the FHA. Pursuant to 24 C.F.R. § 100.75:

Discriminatory notices, statements and advertisements include, but are not limited to: (1) Using words, phrases, photographs, illustrations, symbols or forms which convey that dwellings are available or not available to a particular group of persons because of race, color, religion, sex, handicap, familial status, or national origin.
(2) Expressing to agents, brokers, employees, prospective sellers or renters or any other persons a preference for or limitation on any purchaser or renter because of race, color, religion, sex, handicap, familial status, or national origin of such persons.
(3) Selecting media or locations for advertising the sale or rental of dwellings which

deny particular segments of the housing market information about housing opportunities because of race, color, religion, sex, handicap, familial status, or national origin. (4) Refusing to publish advertising for the sale or rental of dwellings or requiring different charges or terms for such advertising because of race, color, religion, sex, handicap, familial status, or national origin.

**7.** Plaintiffs' reliance on cases such as *Johnson v. Board of Regents*, 263 F.3d 1234 (11th Cir.2001); *U.S. v. Starrett City Associates*, 840 F.2d 1096 (2nd Cir.1988); and *U.S. v. Charlottesville Redevelopment and Housing Auth.*, 718 F.Supp. 461 (W.D.Va.1989), for the proposition of racial motivation is misplaced.

ty "your marketing and outreach activities should be targeted to all segments of the population on a nondiscriminatory basis, promote housing choice and opportunity throughout your jurisdiction, and contribute to the deconcentration of minority and low-income neighborhoods." *Id.* at 9737.

Additionally, the County's language is consistent with that which appears in the Quality Housing Work Responsibility Act ("QHWRA") of 1998. The QHWRA requires public housing authorities to affirmatively further fair housing. The QHWRA states the PHA's "policies that govern eligibility, selection and admissions under its PHA Plan should be designed to reduce racial and national origin concentrations." 24 C.F.R. § 903.2.

In addition to the requirements set forth in the Super NOFA and QHWRA, County Defendants are subject to this Court's mandate to create opportunities for desegregation in its housing programs, including public housing, Section 8 and other housing opportunities programs that come under County control similar to the present HOPE VI revitalization project. *See Ad-*

*ker v. United States Dept. of Housing and Urban Dev.,* Case No. 87–0874–CIV–PAINE (October 28, 1998). It is clear that the County's HOPE VI Plans are consistent with the tenets of the *Adker* Consent Decree.[8]

Plaintiffs, as the movants, have the burden to establish a substantial likelihood of success on the merits on these claims. Without this requisite evidence of discriminatory intent, the Court cannot conclude that Plaintiffs have established a likelihood of success on these claims.

### b. Disparate Impact Claims

■ In the instant case, Plaintiffs further argue that disparate impact occurs in three forms: (1) the forced displacement of the current residents from Scott–Carver Homes; (2) the reduction in the supply of family public housing in the County; and (3) the exclusion of households of certain sizes and income from the new development. (D.E. 14 at 9). Plaintiffs contend that each of these actions have the effect of making housing unavailable or otherwise denying housing opportunities for

**8.** Even if the Court were to find the evidence relied upon by Plaintiffs is circumstantial evidence of discrimination, Plaintiffs cannot meet the burden set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668. Under *McDonnell Douglas* (1) a plaintiff has the burden of proving a *prima facie* case of discrimination by a preponderance of the evidence; (2) if a plaintiff sufficiently establishes a *prima facie* case, the burden shifts to the defendant to "articulate some legitimate, nondiscriminatory reason" for its action; and (3) if the defendant meets this requirement the burden reverts back to the plaintiff to prove by a preponderance that the legitimate reasons asserted by the defendant are in fact mere pretext. *Id.* at 802–03, 93 S.Ct. 1817; *see also Secretary, United States Dept. of Housing and Urban Dev. v. Blackwell,* 908 F.2d 864, 870 (11th Cir. 1990). For the purposes of this preliminary

injunction, Plaintiffs cannot demonstrate that they are able to make a prima facie case. Plaintiffs are required to establish that they are a member of a protected class; that they applied for and were qualified for housing and that in spite of their qualification the County denied them housing on the basis of race and familial status. *Id.*

Although Plaintiffs are able to show that they meet the first criteria, *i.e.,* they are African–Americans, they cannot demonstrate they applied and were qualified for housing and were denied by County Defendants because of their race and/or familial status. Even if the Court finds that Plaintiffs have established a prima facie case, the County Defendants have set forth a legitimate nondiscriminatory reason for their actions. Plaintiffs have not demonstrated that these reasons are pretextual.

current residents of Scott Homes. (D.E. 14 at 9).

In a FHA disparate impact case brought against a public defendant, a plaintiff has the initial burden of presenting a prima facie case of discriminatory effect of the challenged law. *United States v. City of Black Jack*, 508 F.2d 1179, 1184 (8th Cir. 1974). There are four (4) factors courts generally utilize when evaluating a discriminatory impact claim. First, the court must determine the strength of a plaintiff's showing of discriminatory effect. Second, the court must determine what, if any, evidence there is of discriminatory intent. Third, the court must examine what the defendant's interest is in taking the action that is the subject of the complaint. Last, the court must decide whether the plaintiff seeks to compel the defendant to affirmatively provide housing for minorities or merely to restrain the defendant from interfering with individual property owners who wish to provide such housing. *See Metropolitan Housing Dev. Corp. v. Village of Arlington Heights*, 558 F.2d 1283, 1290 (7th Cir.1977).[9] Each of these factors is examined below.

### Strength of Plaintiffs' Showing of Discriminatory Effect

Under the first factor the Court in *Metropolitan Housing Dev.* found that there are two types of discriminatory effect which "a facially neutral decision about housing can produce." *Id.*

> The first occurs when that decision has a greater adverse impact on one racial group than on another. The second is the effect which the decision has on the

community involved; if it perpetuates segregation and thereby prevents interracial association it will be considered invidious under the Fair Housing Act.

*Id.* at 1290.

Plaintiffs, based upon the evidence presented, cannot establish that either the forced or voluntary relocation of current residents, the reduction in the supply of public housing, or the exclusion of households of certain sizes and incomes from the new community, will produce any of the discriminatory effects described above. It cannot be disputed that residents will be relocated whether under the present plan or some other plan. However, it is difficult to ascertain from any of the Plaintiffs' pleadings what form this relocation plan should take. In one instance, Plaintiffs appear to argue that the current relocation plan forces residents to move from their present community to other communities. (D.E. 14 at 9). Plaintiffs then argue elsewhere that the County should relocate residents in areas where their minority group does not predominate. (D.E.92).

Moreover, Plaintiffs attempt to support their claims by reference to the "affordable housing crisis" in Miami–Dade County. (D.E. 1; D.E. 14). County Defendants, however, have put forth factual evidence demonstrating that new affordable housing opportunities will be provided specifically for Scott Homes residents, including Section 8 vouchers, newly revitalized on-site public housing units, and affordable homeownership and rental opportunities both onsite and off-site. (Pls.' Ex. 8). Furthermore, Plaintiffs have not shown how the present plan, as it relates to Scott Homes,

---

**9.** Many courts are in dispute as to whether the factors listed herein should be advanced as part of a plaintiff's prima facie case or whether they are part of the burden shifting analysis to be considered in a final determination on the merits. *Huntington Branch, N.A.A.C.P. v. Town of Huntington,* 844 F.2d 926, 935 (2nd Cir.1988).

will have a greater adverse impact on one racial group over another since, as Plaintiff's have demonstrated, African–Americans make up ninety-nine percent (99%) of the residents within Scott Homes. (D.E. 1; D.E. 14).

### Evidence of Discriminatory Intent

With respect to the second factor, Plaintiffs have presented insufficient evidence to establish the County's "discriminatory intent" as to the disparate impact claims asserted. As explained above in more detail, relying on the single statement in the County's HOPE VI Revitalization Plan does not substantiate the claim of discriminatory intent, especially since the statement refers to requirements set forth by HUD in its Super NOFA and the QHWRA, which are federally issued and over which the County Defendants have no control.

### Defendants' Interest in Taking Its Action

The third factor also weighs in favor of County Defendants as Defendants have articulated reasons that are bona fide and legitimate for their actions, and because there do not appear to be less discriminatory alternatives available that can serve those ends. See Huntington Branch, NAACP v. Town of Huntington, 844 F.2d 926, 939 (2nd Cir.1988). It remains undisputed that Scott Homes meets the definition of "severely distressed," for purposes of qualifying for HOPE VI funding. The evidence demonstrates that the County selected Scott–Carver Homes not because of the racial composition of the development, but because of its poor physical design and structure. According to the County's 1999 HOPE VI Revitalization Plan:

> [a]lthough both of these public housing developments were constructed to meet the rising demand of affordable housing at the time, by modern standards, the developments are antiquated, the units too small and the density simply too high. Added to these undesirable design features are serious structural, site and infrastructure defects, which render Scott Homes and Carver Homes overdue for demolition and redevelopment through the HOPE VI program.

(Pls.' Ex. 8, Revitalization Plan, Ex. A at 1).

Further, Plaintiffs have failed to establish that but for the HOPE VI funds, the County would have the financial means to independently revitalize Scott Homes in the manner in which Plaintiffs seek. (D.E. 118 at 11). As Plaintiffs correctly assert, the County Defendants made three (3) separate attempts to apply for funding to revitalize Scott Homes. (D.E. 1; Pls. Ex. 6 and 7). The County, in its first application in 1996, proposed to demolish 150 of the Scott Homes public housing units, and proposed to rehabilitate the remaining units and maintain them as public housing. Plaintiffs concede that the County's prior HOPE VI application was "far less harmful" to Scott Homes' residents and shows that less discriminatory alternatives are available. (Pls.Ex. 6). As the evidence shows, however, it was not the County, but HUD that declined to fund this project. According to HUD's Acting Deputy Assistant Secretary, one of the reasons the County's 1999 HOPE VI application was funded was because it proposed to demolish all of the public housing units and "it significantly reduced the number of public housing units that would be put back on site of Scott and Carver." (D.E. 53, Exhibit A, Ozdinec Decl. ¶ 5).

The County Defendants have taken steps to address some of Plaintiffs' con-

cerns. Subsequent to HUD's approval of the HOPE VI Revitalization Plan, the County Commission adopted two resolutions to increase the number of affordable housing units to be built off-site within the Scott–Carver HOPE VI target area. (Defs.' Exs. 1 and 2). Pursuant to these resolutions, Scott–Carver Homes' residents will be provided with the right of first refusal for these newly constructed units. Thus, the County Defendants have articulated there are no less discriminatory alternatives available.

### Determination of Plaintiffs' Intended Relief

Finally, with regard to the fourth factor, Plaintiffs are essentially seeking to compel the County to take affirmative action with respect to their housing opportunities. As stated by the Seventh Circuit:

> The Courts ought to be more reluctant to grant relief when the plaintiff seeks to compel the defendant to construct integrated housing or take affirmative steps to ensure that integrated housing is built than when the plaintiff is attempting to build integrated housing on his own land and merely seeks to enjoin the defendant from interfering with that construction.

*Metropolitan Housing Dev. Corp. v. Village of Arlington Heights,* 558 F.2d 1283, 1293 (7th Cir.1977). Accordingly, as Plaintiffs are seeking affirmative action from the County, this factor weighs against the relief Plaintiffs seek.

In sum, Plaintiffs have failed to establish a likelihood of success on the merits on either their discriminatory intent or disparate impact arguments with respect to their Fair Housing Act, Civil Rights Act of 1964 or Equal Protection claims.

### 2. Quality Housing and Work Responsibility Act Claim

■ Plaintiffs also fail to show a substantial likelihood of success on their Quality Housing and Work Responsibility Act claim. Plaintiffs argue, *inter alia,* that the County has failed to meet the requirements of the QHWRA insofar as it failed to consider the racial and socioeconomic effects of the plan's proposed demolition of the public housing units, and that the County's HOPE VI application includes no analysis of the racial and socioeconomic effects of the HOPE VI plan. Plaintiffs, however, have failed to show any discriminatory intent or disparate impact as a result of the Revitalization Plan. Their claim that the Revitalization Plan fails to include a socioeconomic study is without merit since the Revitalization Plan approved by HUD includes a study completed on May 20, 1999 by Goodkin Consulting, which measured the economic feasibility in the redevelopment area. Furthermore, even if Plaintiffs dispute the study's validity or compliance with the requirements of QHWRA, HUD approved the Revitalization Plan with the study. Moreover, even if Plaintiffs were correct in their arguments, it does not appear that the issuance of an injunction would be an appropriate remedy.

### 3. Housing and Community Development Act Claims

■ Pursuant to the Housing and Community Development Act ("HCDA"):

> governmental agencies or private developers shall provide within the same community comparable replacement dwellings for the same number of occupants as could have been housed in the occupied and vacant occupiable low and moderate income dwelling units demolished or converted to a use other than for housing for low and moderate income persons, and provide that such replacement housing may include existing hous-

ing assisted with project based assistance provided under section 1437f of this title.

42 U.S.C. § 5304(d)(2)(A)(i). Plaintiffs assert that pursuant to 42 U.S.C. § 5304(d), any "project assisted with Community Development Block Grant ("CDBG") funds, must provide within the same community comparable replacement dwellings for the same number of occupants." [10] (D.E.1). In this case, the County committed as part of its matching funds $2 million in CDBG funds. By making this claim, however, Plaintiffs, in essence, ignore the history of and eventual elimination by Congress of the one-for-one replacement requirements for the HOPE VI Program.

Prior to the existence of HOPE VI, HUD administered the now defunct Urban Revitalization Demonstration ("URD") Program. Under the URD Program, in HUD's appropriations act in the early 1990s, Congress earmarked significant grant funds for award to "troubled" public housing agency's ("PHA") and PHAs in cities with more than a certain population threshold to prompt those PHAs to develop and implement innovative, comprehensive strategies for the revitalization of those PHAs' most troubled public housing projects and their surrounding neighbor-

hoods. *See* Title II of Pub.L. 102–389, 106 Stat. 1579–1581 (1992). After several years of funding the original large-city URD PHAs, Congress enacted and eventually codified permanent legislation that authorized the HOPE VI program. The HOPE VI program is a competitive grant program open to a far wider range of PHAs that serves precisely the same purposes as the URD Program and has largely similar programmatic requirements. *See* 42 U.S.C. § 1437v.

At the time of Public Law 102–389's enactment in 1992, Section 18 of the U.S. Housing Act, 42 U.S.C. § 1437p, required PHAs to include as part of their applications to demolish public housing units both a plan for relocation of each tenant displaced by such demolition and a plan for replacement within six years of each public housing unit demolished or sold.[11] Compliance with Section 18's "one-for-one" replacement requirement—the resources for which were usually provided by HUD upon its approval of a demolition/disposition application—could be achieved either via the creation of a new "hard" unit of low-income housing or, to a limited extent, via the provision of Section 8 rent subsidies to an expanded number of families. In July 1995, however, Congress enacted Section 1002 of Pub.L. 104–19, 109 Stat.1994, 235

---

10. CDBG funds are federal funds allocated to the County by HUD. The evidence shows that part of the HOPE VI Grant Application included a budget, which referenced the commitment of $2 million in CDBG funds towards this project. The proposed use of these funds is for infrastructure construction of the new planned community. (Pls.' Ex. 8, Revitalization Plan, Attach.s 17, 18, and 26.) The undersigned finds that a less than 2% infusion into a project for infrastructure construction does not dictate the rules in which a project is implemented and arguments to the contrary are meritless. Accordingly, the Court cannot compel the County Defendants to construct the new units on a one-for-one basis because

of a commitment of $2 million in CDBG funds.

11. Under Section 18, tenants who were displaced by a project's demolition were entitled merely to be relocated to other housing; a PHA had no obligation to consider the displaced tenants for residence in the new replacement units created, often years later. The URD statute provided that families displaced by URD demolition must at least be considered "eligible for residence in any low-income replacement units." Pub.L. 102–389, 106 Stat. 1579, 1580.

(1995), a HUD supplemental appropriations and rescissions act[12], which eliminated[13] retroactively the requirement that PHAs replace units of public housing that HUD has certified as obsolete, and in every appropriations act enacted thereafter, Congress continued to suspend the replacement requirement for newly approved demolitions and dispositions, until Congress ultimately eliminated the requirement permanently in 1998.[14]

Section 18 of the U.S. Housing Act, the only Act previously requiring one-for-one replacement for HOPE VI-type projects, no longer affords Plaintiffs grounds to argue that the County's HOPE VI Revitalization Plan is deficient because it fails to provide for creation of one public housing unit for each public housing unit demolished. In fact, a similar argument was made by the plaintiffs and rejected by the District Court in *Darst–Webbe Tenant Ass. v. Saint Louis Housing Auth.*, 202 F.Supp.2d 938 (E.D.Mo.2001). In that case, the housing authority sought to demolish through its HOPE VI grant the existing public housing development and to replace it with a newly constructed mixed income housing project. As part of their claims for relief, plaintiffs sought to

[enjoin] the federal defendants to withhold or withdraw from the City of St. Louis any commitment of Section 108 loan guarantee assistance until such time as the City has an antidisplacement and relocation plan that provides for all occupied and vacant occupiable low-income dwelling units demolished in connection with a CDBG-assisted activity to be replaced in the same community with comparable replacement dwellings for the same number of occupants and until the HOPE VI plan is revised to provide for replacing in the same neighborhood and in the required numbers and sizes of all the occupied and vacant occupiable low-income dwelling units slated for demolition.

*Id.* at 945. The Court, however, in a prior ruling, held that the one-for-one replacement of the demolished units was not a remedy available to plaintiffs. *Id.*

Similarly, in the instant case, Plaintiffs have failed to demonstrate that a one-for-one replacement of the Scott Homes units is a remedy that is available to them. Congress specifically eliminated the one-for-one replacement requirements for HOPE VI funded projects. Therefore, a preliminary injunction requiring the Coun-

---

12. The title of the Act is the "Emergency Supplemental Appropriations for Additional Disaster Assistance, for Anti–Terrorism Initiatives, for Assistance in the Recovery from the Tragedy that Occurred in Oklahoma City, and Rescissions Act, 1995."

13. *See* Section 1002(a)(3), striking the language of Section 18(b)(3) as it then existed.

14. *See* Section 531 of the Quality Housing and Work Responsibility Act of 1998, as enacted by Title V of the Department of Affairs and Housing and Urban Development, and Independent Agencies Appropriations Act of 1999. In addition, an analysis of the legislative history indicates that Congress intended to eliminate the one-for-one replacement re-

quirement under the Housing Act of 1937 for the following reasons:

> The one-for one replacement requirement has been one of the major impediments to eliminating the most distressed public housing and revitalizing public housing communities. Because there typically have been no funds to fulfill the requirement, as well as an insufficient number of suitable sites for replacement housing, the one-for-one replacement requirement has simply prevented the demolition of obsolete and dangerous projects.

S. Rep. No. 21, 105th Cong., 1st Sess. at 25 (1997).

ty Defendants to develop a revitalization plan that complies with the requirements of HCDA simply because there has been a commitment of $2 million—which amounts to only 1.89% of the present $106 million dollar project—would violate the tenets of HOPE VI and the Congressional intent described herein.

On a practical level, even if the Court could compel the County Defendants to replace each of the units on a one-to-one basis, the Court could not fashion such a remedy for the Plaintiffs because the evidence presented makes it apparent that the County Defendants have insufficient financial resources to independently build such a project, and that HUD would probably not fund such a project.[15]

More importantly, Plaintiffs have not made a facial or as-applied constitutional challenge to the legislation that enacted HOPE VI and eliminated the one-for-one replacement requirement. Plaintiffs cannot request one-for one type replacement relief where the legislation does not require the same. Thus, the undersigned cannot recommend such relief where Plaintiffs have not challenged the constitutionality of the HOPE VI legislation.

## C. PLAINTIFFS HAVE NOT MADE A SUFFICIENT SHOWING OF IRREPARABLE HARM

■ Plaintiffs have failed to provide sufficient compelling evidence that they would suffer irreparable injury. No evidence was presented during the evidentiary hearing that any of the witnesses or the persons whom they represent would be prohibited from relocating from Scott Homes or that they were denied the right to return to the new development. In contrast, the County Defendants have demonstrated a legitimate interest in pursuing its HOPE VI Revitalization Plan as approved and would suffer provable damages in the event the project is halted or delayed by a preliminary injunction.

As Plaintiffs have not shown a substantial likelihood of success on the merits or that they will suffer irreparable harm, the undersigned need not address the remaining factors required for the issuance of an injunction. Accordingly, the undersigned recommends that Plaintiffs' Motion for Preliminary Injunction (D.E.13) be denied in its entirety.

Pursuant to S.D. Fla. Magistrate Rule 4(b), the parties may serve and file written objections with the Honorable Shelby Highsmith, United States District Judge, within ten (10) days after being served with a copy of this Report and Recommendation. Failure to file objections timely shall bar the parties from attacking on appeal any factual findings contained herein. *RTC v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir.1993); *LoConte v. Dugger*, 847 F.2d 745 (11th Cir.1988).

Sept. 11, 2002.

### *ORDER*

This Cause comes before the Court on Defendants' Motion to Strike (D.E.132). The Court having reviewed the record, and

---

**15.** *Cf. Smith v. Town of Clarkton*, 682 F.2d 1055 (4th Cir.1982) where the Court found defendants violated FHA and Fourteenth Amendment when it withdrew "multimunicipality low-income housing authority," thereby blocking construction of low-income units with federal funds. The Court found that it was proper to require defendants to reinstitute the procedures, but found it improper to compel the defendant to construct the units using locally generated funds where construction had not begun. *Id.* at 1069.

being otherwise fully advised in the premises, it is hereby

ORDERED AND ADJUDGED that Defendants' Motion to Strike (D.E.132) is GRANTED. Paragraphs 46 and 101 of Plaintiffs' Proposed Findings of Fact and Conclusions of Law are hereby STRICKEN.